THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KEITH McINTOSH, Defendant-Appellant.

First District (2nd Division)    No. 78-103

Opinion filed March 13, 1979.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Michael R. Sherwin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

The defendant Keith McIntosh was convicted of murder and sentenced to a term of 40 to 60 years. On appeal he contends (1) that the trial court erred in excluding impeachment evidence offered against a prosecution occurrence witness, and (2) that the State failed to prove him guilty beyond a reasonable doubt. The following testimony was adduced at the jury trial of the defendant and co-defendant Willie Jefferson.[1]

Kerry Mullins testified for the State that at approximately 7:30 p.m. on June 4, 1975, he and Richard Germaine, the victim, were riding on a motorcycle when they stopped at the corner of 87th and Ashland Avenue to talk to a group of men which included the defendant, the co-defendant Willie Jefferson, Jimmie Hayes, Earl Washington, Charlie Jones, and Michael Patterson. Richard Germaine talked to Willie Jefferson for approximately 15 minutes and then returned to the motorcycle with Mullins to drive to Germaine's house. Mullins proceeded to a girl's house leaving Germaine at his home. Richard Germaine, Sr., the father of the victim, testified that Richard changed his clothes and left the house again at about 8:10 p.m.

Mullins later saw the victim and the same group of men including the defendant as he was walking south on the west side of the street at 87th and Marshfield Streets. Mullins also saw State's witness Richard Bush at the south end of the block, although he could not see his face. There were streetlights in the area at the time. When Mullins was approximately 100 feet from the group, Richard Germaine walked away from the group toward the south end of the block. Mullins testified that at this time co-defendant Willie Jefferson hit Germaine on the head with a gun and then shot him in the back and again in the front. As Germaine fell to the ground, the defendant pulled a gun and fired at him two or three times.

---

[1] The appeal involving Willie Jefferson, No. 78-538, is currently pending before this court.

Germaine was on the ground when the last shot was fired. The group then dispersed toward 88th Street and Mullins ran to his home.

Prosecution witness Richard Bush testified that shortly before 9 p.m. on June 4, 1975, he saw Germaine riding in a car with Graylin Clark in the vicinity of 87th and Ashland Avenue. After Bush entered the car, the three of them drove to 87th and Marshfield Streets where, when they were 10 feet away, Bush recognized a group of men including the defendant, the co-defendant Willie Jefferson, Michael Patterson, Jimmie Hayes, Chuckie Jones, and Earl. Although Bush knew Kerry Mullins, he did not see him in this area that evening. According to Bush, Germaine got out of the car to talk to Willie Jefferson while he and Clark drove south on Marshfield to look for a parking space. Bush got out of the car at 88th and Marshfield and started walking north. When Bush was approximately six houses from the group of men, he saw Germaine, the defendant, and the others walking toward him on the same side of the street. When the group was approximately three houses away, Bush summoned Germaine to come away. As Germaine turned to acknowledge Bush's call, the co-defendant Willie Jefferson struck him on the back of the head with a gun and shot him in the back. Germaine then turned to face Jefferson who then shot him once in the front. Bush testified that at this time the defendant pulled out a gun and started shooting, too. After seeing the defendant shoot twice and after four shots altogether, Bush ran to a friend's apartment.

Both Mullins and Bush testified that they had known the defendant for six months and the co-defendant for two years, and that the streetlights were on at the time of the incident. Bush also testified that it was dusk dark at the time. Both identified the defendant and co-defendant at trial as the men who had participated in the murder of Germaine.

Officer James Raspberry testified that at approximately 9 p.m. on June 4, 1975, he was watching television in his home at 8800 South Marshfield when he heard four or five shots. Upon going to the front door and hearing someone call for help, Officer Raspberry secured his gun and walked to 8748 South Marshfield. There he found Germaine lying approximately 100 feet in front of the house at 8748. Crouching down, Raspberry had the following conversation with Germaine:

"He said to me, 'Please help me, please help me.'

I said, 'What's wrong with you?'

He says, 'I got shot.'

\* \* \*

I said, 'Who shot you?'

He answered back, 'Willie Jefferson shot me.'[2]

---

[2] Actually the victim said "Will Kill shot me." However, the parties stipulated that Willie Jefferson's nickname "Will Kill" would not be used at trial.

* * *

I asked him where are they. He said they both ran."

At approximately 9:15 p.m., Officer John Conlon and his partner arrived at the scene. When Officer Conlon asked Germaine who shot him, he answered "Willie Jefferson."

Germaine was taken to Little Company of Mary Hospital where he was examined in the emergency room by Dr. Abdul Kahn. Although Dr. Kahn did not notice any bruises on the victim's head, he found four gunshot wounds in the victim's groin, belly, and back. Germaine went into massive shock and cardiac arrest and died on June 16, 1975. Upon autopsy, Dr. Joseph Claparols found four bullet wounds on external examination and removed two bullets from the victim. It was both doctors' opinions that Germaine died as a result of the gunshot wounds.

On June 17, 1975, Investigator John Dorn and several other officers arrested the defendant at his home. They discovered a revolver loaded with six live rounds in the defendant's bedroom in a pile of clothes.

Richard Chenow, a firearm's technician, testified that the two bullets he received from the Coroner's Office which he had labeled "B" and "C" matched the gun discovered in the defendant's bedroom. Chenow further testified that he had received another bullet which he had labeled "A" from Little Company of Mary Hospital, and that it, too, matched the gun.

Anthony Wayne Ward testified for the defendant that on June 4, 1975, between 6 and 7 p.m., he and a friend were approximately 10 houses down from 87th and Marshfield when he saw four or five individuals and Germaine across the street shooting dice in Marshfield Park. After about 20 minutes, an argument ensued between Germaine and two of the other men whom Ward recognized but did not know. The two other men left in a car and Germaine started walking south on Marshfield. According to Ward, a brown car pulled up to Germaine, three men jumped out, "cross" words were exchanged, three or four shots were fired, and the men fled in different directions. Ward testified that he did not see Kerry Mullins, Richard Bush, the defendant, or Willie Jefferson in the area at the time. After about a minute, Ward crossed the street when Officer Raspberry arrived. From within three or four feet of Germaine, Ward heard him yell "Will Kill" several times.

Ward testified that he had not told Raspberry or the other officers at the scene that he had seen who shot Germaine. However, he further testified that five days after the shooting he had told Officer DiGiacomo that he knew who had shot Germaine and could recognize him. Officer DiGiacomo denied that Ward had told him this. Investigator Dorn testified that Ward had told him that he had heard about the shooting, but that he was not there at the time.

DeLoach Brown testified for the defendant that on June 4, 1975, he was walking to Marshfield Park when he saw three men jump out of a car

on Marshfield Street and start shooting. Brown did not see Germaine, Mullins, or Bush in the vicinity at the time. Although he testified that he could recognize the offenders, he further testified that he did not know their names and that they were not in the courtroom.

The defendant testified that on the night of June 4, 1975, he was sitting on a porch at 8728 South Marshfield with Tanya Birdey when he saw Germaine walk past in a southerly direction. According to the defendant, he then heard shots, jumped up, saw a crowd running, and then returned to his conversation with Tanya. He stated that he did not see either Mullins or Bush in the vicinity that night.

## I.

The defendant first contends that the trial court erred in excluding extrinsic evidence offered to cast doubt on the credibility and veracity of State witness Richard Bush.

Richard Bush had testified on direct examination that he was present at the scene, and that he had seen the defendant pull out a gun and shoot twice. On cross-examination the following ensued:

"Q. Did you ever have any trouble with him [the defendant]?
A. No, I haven't.
Q. Never at all?
A. Never.
Q. Did you like Keith McIntosh?
A. I have nothing against Keith McIntosh at all."

DeLoach Brown testified for the defendant that about a week prior to his testimony he saw Bush with Kerry Mullins and a girl. The State's attorney objected when Brown was asked whether he had overheard Bush's conversation with the others. During a sidebar, the defendant's attorney made an offer of proof that Bush had made a statement contrary to his testimony in court. The court sustained the State's objection and granted its motion to prevent any questioning regarding any statements Bush or Mullins may have made at that time.

Subsequently, the co-defendant's attorney asked Brown whether he had heard someone say during that conversation, "I hate the sons-of-a-bitches and I'm going to get even with them." The State again objected and renewed its motion in limine. The defense attorney made an offer of proof that Brown would have testified that he had overheard a conversation between Bush and Mullins in which Bush had stated that he was not present at the shooting and that he was determined to hurt the two defendants. The State argued there was not a proper foundation for the introduction of Brown's testimony. The trial court granted the State's motion to exclude it.

A.

It is undisputed that Brown's testimony concerning Bush's alleged prior statements was inadmissible as substantive evidence to prove the truth of the facts asserted therein. (See *People v. Collins* (1971), 49 Ill. 2d 179, 198, 274 N.E.2d 77; *People v. Powell* (1973), 53 Ill. 2d 465, 472, 292 N.E.2d 409.) However, the defendant contends that Brown's testimony was admissible as impeaching evidence offered to show Bush's bias toward the defendant.

■■ ■ Although the widest latitude is permitted a defendant in cross-examining a witness for the purpose of showing bias (*People v. Mason* (1963), 28 Ill. 2d 396, 403, 192 N.E.2d 835), a proper foundation must be laid for the admission of extrinsic evidence offered to show bias or prior inconsistent statements following the cross-examination of the witness to be impeached (*People v. Powell* (1973), 53 Ill. 2d 465, 473, 292 N.E.2d 409; *People v. Payton* (5th Dist. 1966), 72 Ill. App. 2d 240, 248, 218 N.E.2d 518; *People v. Terranova* (1st Dist. 1977), 49 Ill. App. 3d 360, 365, 364 N.E.2d 357). This rule is designed to (1) protect the witness against unfair surprise, (2) permit diffusion of the inconsistency by explanation or denial by the witness (*People v. Powell*; *People v. Henry* (1970), 47 Ill. 2d 312, 321, 265 N.E.2d 876; *People v. Brown* (1st Dist. 1977), 47 Ill. App. 3d 920, 929, 365 N.E.2d 514), and (3) focus the attention of the trier of fact on the alleged statement so that the trier will be less likely to speculate that the later extrinsic proof of the prior statement is substantive evidence (*People v. Harbin* (1st Dist. 1975), 31 Ill. App. 3d 485, 490, 334 N.E.2d 379).

■■■ The elements of laying a proper foundation are: (1) contradictory and inconsistent statements must in fact be present; (2) such must be material to the testimony of the witness; (3) such earlier statements must be read or shown to the witness; and (4) the witness must deny making such earlier statements (*People v. Brown* (5th Dist. 1972), 6 Ill. App. 3d 500, 504, 285 N.E.2d 515). A proper foundation is typically laid by directing the attention of the witness to the time, place, to whom made, the substance of it, and other circumstances of the inconsistent statement. (*People v. Henry*, at 321; *People v. Payton*, at 248.) Relying on *People v. Henry*, the defendant argues that these conventional and formal foundation standards need not be rigidly adhered to if the questions propounded on cross-examination satisfy the reasons for the rule. Although we agree with this holding as it applied in *Henry*, we do not believe that the foundation laid here falls within it.

In *Henry*, the witness whom the defendant sought to impeach denied and then later claimed that she did not remember having a conversation with her aunt and others concerning a statement that she had given the police. Witnesses were then called who would have testified that such a

conversation did occur in which the witness told them that she had given the statement to the police only after she had allegedly been coerced to do so. The court found that it would have been natural for the witness to have told of the claimed coercion in her direct testimony so that its omission made the two statements inconsistent and impeaching. The court further found that the reasons for the foundation rule had been fulfilled because she had been afforded the opportunity to explain the alleged conversation, but her responses to the threshold questions made further inquiry into the matter a futile exercise. (See *People v. Powell*, at 473-74.) Thus, the court concluded that the foundation was sufficient. Such is not the situation here.

In this case, the defense attorney made no reference whatsoever to the conversation which Bush allegedly had with Mullins during the cross-examination of Bush. The supreme court in *People v. Powell* reaffirmed its holding in *Henry*, but, applying the standard, found the foundation inadequate on this very basis, stating:

> "The present case, however, is factually distinguishable because the record discloses that although Harris was subjected to extensive cross-examination, defense counsel never inquired if Harris had told Thomas Johnson that he killed the dispatcher. Harris was not afforded the opportunity to explain or deny the substance or existence of this alleged conversation." *People v. Powell*, at 474.

Similarly, in *People v. Sanders* (1974), 56 Ill. 2d 241, 306 N.E.2d 865, *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1143, 94 S. Ct. 3178, without citing *Powell*, the court cited and relied on pre-*Henry* cases to support the conclusion that a proper foundation "normally consists" of the traditional requirements (*People v. Sanders*, at 251). The court found the foundation imperfect because the State had failed to ask the witness whether she had made the statement attributed to her. This court has also upheld the exclusion of impeaching evidence for counsel's failure to confront the witness with the substance of the alleged prior statement. See *People v. Brown* (5th Dist. 1972), 6 Ill. App. 3d 500, 504, 285 N.E.2d 515; *People v. Terranova*, at 365; *People v. Harbin*, at 490.

Based on the foregoing, we conclude that, at the very least, either (1) the witness must be confronted with the contents of the statement, or (2) there must be a denial that the witness ever had any conversation with the individual or about the subject before extrinsic evidence of the impeaching statements may be introduced. (See M. H. Graham, *Prior Inconsistent Statements—Impeachment and Substantive Admissibility: An Analysis of the Effect of Adopting the Proposed Illinois Rules of Evidence*, 1978 U. Ill. L. F. 329-47.) Accordingly, we hold that the trial

court properly excluded Brown's testimony due to defense counsel's failure to meet even this minimum of a foundation requirement.[3]

## II.

The defendant next contends that there remain serious questions as to his presence at the scene and his involvement in the crime which preclude a finding of guilt beyond a reasonable doubt. In addition to his contention that Bush's testimony should have been viewed in light of Brown's impeaching testimony, the defendant urges us to consider (1) the alleged inconsistency between Bush's and Mullins' testimony that the victim had been struck on the head and Dr. Kahn's failure to notice bruises on his head; (2) the alleged inconsistency between these witnesses' testimony that each defendant had pulled a gun and the recovery of only one gun; (3) Mullins' viewpoint from which he identified the defendant at the scene; (4) the victim's failure to name the defendant when asked by Officers Raspberry and Conlon who had shot him; (5) the inference raised by the defendant that the gun found in his bedroom had been planted there; and (6) the defense witnesses' testimony not placing him in the vicinity at the time.

Although a conviction which rests on a vague, uncertain, and doubtful identification must be reversed (*People v. Cullotta* (1965), 32 Ill. 2d 502, 504, 207 N.E.2d 444), Illinois law is clear that an identification by a single eyewitness is sufficient to sustain a verdict even though such testimony is contradicted by the accused or alibi witnesses, provided that the witness is credible and viewed the accused under such circumstances as would permit a positive identification to be made (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Attaway* (1st Dist. 1976), 41 Ill. App. 3d 837, 857, 354 N.E.2d 448).

Where "the evidence is irreconcilably conflicting, it is the peculiar prerogative of the trier of fact * * * to ascertain the truth." (*People v. Hammond* (1970), 45 Ill. 2d 269, 278, 259 N.E.2d 44.) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion; People v. Wade* (5th Dist. 1977), 51 Ill. App. 3d 721,

---

[3] Our opinion is not altered by the defendant's assertion that the trial court's adherence to the technical rules of laying a foundation deprived him of due process and rendered the trial fundamentally unfair. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.) Although requiring the formal "who, what, when" questions may rise to the degree of technicality rejected in *Chambers*, we are of the opinion that merely requiring that the witness be confronted with the statement does not. Moreover, the record is devoid of any suggestion that Brown's testimony would have been supported by other evidence. Therefore, we also find the indicia of reliability relied upon in *Chambers* missing in this case. See *People v. Craven* (1973), 54 Ill. 2d 419, 429, 299 N.E.2d 1.

726, 366 N.E.2d 528.) The jury may also draw inferences from the evidence presented and those inferences should also be accepted unless they are inherently impossible or unreasonable. *People v. Hahn* (4th Dist. 1976), 39 Ill. App. 3d 969, 982, 350 N.E.2d 839.

First, both Mullins and Bush positively identified the defendant as one of the perpetrators of the crime. Both were standing on a well-lighted street at dusk dark and had known the defendant for six months. Mullins was standing only 100 feet from the defendant at the time. Secondly, although the defendant's alibi was not contradicted, it was also not directly corroborated by the defense witnesses. Moreover, although the victim had told the officers that the co-defendant had shot him, neither of the defense witnesses placed either the defendant or the co-defendant at the scene. Thirdly, we do not think it improbable that in his concern for the victim's multiple gunshot wounds Dr. Kahn overlooked the injuries to his head, or that the three bullets recovered and identified to the gun found in the defendant's bedroom could be attributed to the 2-3 shots fired by the defendant. Nor do we believe it inherently unreasonable or impossible for the jury to have inferred from the gun's presence in the defendant's bedroom that it belonged to him and had been placed there by him. Finally, we find *People v. Coulson* (1958), 13 Ill. 2d 290, 149 N.E.2d 96, relied upon by the defendant, clearly factually inapposite.

■■ Upon our consideration of the record, we are of the opinion that there was sufficient credible evidence for the jury to conclude that the defendant was guilty beyond a reasonable doubt of the murder of Richard Germaine. Accordingly, we affirm the conviction.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.