THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHAWN HOSTY, Defendant-Appellant.

First District (2nd Division) No. 85—1509

Opinion filed August 5, 1986.

Steven Clark and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Susan Davis Brunner, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

After a bench trial, defendant Shawn Hosty was convicted of murder, armed violence and concealment of a homicidal death, and was sentenced to 40 years' imprisonment. He raises the following issues on appeal: (1) the trial court erred in limiting the scope of cross-examination of the State's chief witness; (2) he was not proved guilty beyond a reasonable doubt of murder; (3) the trial court erred in imposing judgment on two counts of murder where only one death was involved; (4) the trial court erred in entering judgment and imposing sentence on a conviction of armed violence based on a murder for which defendant was also convicted and sentenced; (5) the trial court improperly imposed a 40-year sentence for the Class 3 felony of concealment of a homicidal death; and (6) the sentence was excessive.

Marilyn Kogelis testified for the State that she had been married to the deceased, Eugene Kogelis. She saw him come home at 3 a.m. on November 6, 1983. He was high on heroin and left the house at 11:30 a.m. Around noon, defendant, a friend of Eugene's, called asking for him. He told Marilyn that Eugene had stolen $1,700 worth of heroin from him and he requested that she tell Eugene defendant was looking for him. She last saw her husband around 2 p.m. that afternoon, high and sitting in his car at his mother's house. She gave him defendant's message. Defendant phoned after November 6, asking where her husband was. On November 30 she saw her husband's car in a parking lot at O'Hare Airport.

Helen Kogelis saw Eugene, her son, at her home at 4 p.m. on November 6. The doorbell rang at 5 p.m. and Eugene stepped outside with defendant, who was yelling at him, and Pat Stomp, one of Eugene's heroin sources. Defendant and Stomp left after about 10 minutes, and Eugene left the house at 7 p.m. After she had gone to bed, she heard him leave the house again at 10:30 that night. After her daughter-in-law reported seeing Eugene's car at the airport, it was towed to a garage in Calumet City.

Police officer Kelly Matthews viewed Eugene's body in the trunk of that car on December 9. There were multiple puncture wounds in the head and body, scrape marks, and leaves and weed particles on the body and clothes. On December 10 defendant was arrested on an unrelated drug charge and was questioned about the homicide. Matthews told defendant he thought defendant was involved in the murder of Eugene Kogelis, but defendant was not arrested again and charged with the murder until January 11, 1984.

On December 19 Matthews met with Kathleen Wolf, who had lived with defendant from August 1981 to September 1983 and who had come forward with information on the murder. He obtained an order to install listening and taping devices in her apartment and on her phone from December 28 to January 7, 1984. Matthews testified that he never told Wolf what to ask defendant nor directed her conversations with defendant. Defendant visited Ms. Wolf's apartment once or twice between December 28 and January 7.

Kathleen Wolf testified for the State that she saw defendant and Pat Stomp in front of Stomp's mother's house around 4:15 p.m. on November 6, 1983. Defendant got in Wolf's car and said that Eugene Kogelis had taken from him heroin valued at $1,700. Defendant stated that he and Stomp were going to look for Eugene. Later that day, Wolf drove defendant to Eugene's parents' home and waited while he confronted Eugene. She drove defendant home after about 20 minutes, and he told her that Eugene was going to come over to explain what had happened to the heroin. Defendant said he got a gun from his brother and that he intended to kill Eugene. At the defendant's house Wolf asked defendant if he was really going to kill Eugene, and he told her not to worry, that he knew what he had to do.

Later, while they were watching television upstairs, defendant answered the door and Wolf heard voices from downstairs. Defendant called up to her that it was Eugene and that they were going to walk the dog. After five minutes she heard 4 to 5 gunshots, a pause and one more shot. Defendant came back in and told her he had killed Eugene, who had said "don't do it" after being shot in the back. She saw blood on his pants and socks. Defendant said he had to move the body closer to the house, and when he returned he had removed his pants and socks. He told her he had dragged the body closer and had covered it with leaves. He said she was his alibi and they were waiting for Billy Vanderver to come and take the body to the airport. Stomp and defendant's brother came to the house, and Stomp asked to see the body. He and defendant went to the base-

ment after he and defendant came back in, and defendant handed Stomp a small bag. When Wolf left the house she saw deceased's car in the driveway.

She next saw defendant at his home on November 12. He told her not to say anything about the murder or she would be dead. He said he and Vanderver had taken the body to the airport that night. She testified that at a preliminary hearing she had said that defendant told her that Vanderver had melted the gun down. Defendant came to her apartment on November 19. When she asked if the body had been found, he told her that no one knew anything. In later conversations, he told her that only she, Pat and Denise Stomp, Billy Vanderver, Joe Hosty and Mike Hurley knew about the murder. On December 9 he called her on the pay phone in her building and told her that the deceased's body had been found, and that he wanted to meet with her. He called her at work and arranged a meeting at a motel; however, she did not go into the motel because it was surrounded by police.

On December 18 defendant called to say he had been picked up for questioning and would be over. He and Wolf went to a coffee shop where he told her the police had no clues and if she kept quiet he would not be stuck with the murder. Defendant warned her the police might try to trick her. On December 26 he told her he had worn work clothes during the murder and that there were no fingerprints. He burned the gloves and clothes he wore and he and Vanderver had driven the body to O'Hare. Defendant also said that Pat Stomp had been sentenced in Indiana that day and that he was afraid Stomp might talk to get a lighter sentence.

During cross-examination of Wolf, the State objected to defendant's attempt to question Wolf about the taped conversations with defendant, because the period of time went beyond the scope of the direct examination and would be hearsay. The trial court sustained the objection and later denied a defense motion to have Wolf declared the court's witness.

Defendant testified that he attempted to find Eugene Kogelis because he believed Eugene had stolen from him 17 grams of heroin. He saw Kathleen Wolf in the area and also argued with Eugene in front of Eugene's parents' home on November 6. Eugene had not admitted taking the heroin, and defendant was not satisfied with the meeting. He did not see decedent after that afternoon, and had called Marilyn Kogelis on November 7, 8, and 9, trying to locate Eugene.

The parties stipulated that four bullet wounds caused Eugene Ko-

gelis' death and that leaf material taken from his body and from the car could have come from behind defendant's home. The court found defendant guilty of murder, armed violence and concealment of a homicidal death. It denied defendant's motion for a new trial and sentenced defendant to 40 years' imprisonment.

Defendant first contends that it was reversible error for the trial court to sustain the State's objection to his cross-examination of Kathleen Wolf concerning the taped conversations with defendant. He urges that the trial court improperly restricted the cross-examination because other State witnesses had testified to the taping, and because the evidentiary rule of completeness entitled him to explore the taped conversations.

Initially, we note that the tape recordings were tendered to defendant during discovery and that he does not claim surprise or prejudice in preparing his case with regard to their existence or content. We also note that in his appellate briefs defendant has repeatedly referred to an offer of proof he allegedly made regarding the taped conversation he wished to use in cross-examining Wolf. However, defendant conceded during appellate oral argument that he never made such an offer of proof during the trial. Indeed, the record reflects that defendant did not make an offer of proof even after the trial court sustained the State's objection to defendant's improper commentary to the court concerning the tape recordings' contents. Defendant first made known to the trial court in a motion for a new trial just two statements excerpted from the tape recordings. At that time he argued that he stated on the tapes, "I didn't do anything, you didn't do anything" and "I never went to the airport." On appeal, he focuses on these remarks, characterizing them as exculpatory.

 As a general rule the scope of cross-examination is limited to the subject matter of direct examination. (*People v. Agosto* (1979), 70 Ill. App. 3d 851, 856, 388 N.E.2d 1018; *People v. Yancey* (1978), 57 Ill. App. 3d 256, 264, 372 N.E.2d 1069.) Limiting the scope of cross-examination preserves the usual order of proof on plaintiff's case in chief. (E. Cleary & M. Graham, Illinois Evidence, sec. 611.10 (4th ed. 1984).) It is true, as defendant contends, that inquiry should be allowed into matters which explain, qualify, modify or discredit the testimony on direct examination. (*People v. Williams* (1977), 66 Ill. 2d 478, 486, 363 N.E.2d 801.) However, it is improper to permit cross-examination on irrelevant matters or ones so remote as to be collateral. (See *People v. Mannen* (1977), 46 Ill. App. 3d 61, 63-64, 360 N.E.2d 563.) It is not error for a trial court to refuse to permit

a cross-examiner to go beyond the scope of the direct examination in an effort to present his theory of the case. (*Telpner v. Hogan* (1974), 17 Ill. App. 3d 152, 158, 308 N.E.2d 7.) The latitude to be allowed in cross-examination rests in the sound discretion of the trial court. (*People v. Myers* (1980), 92 Ill. App. 3d 229, 230, 415 N.E.2d 1108.) Absent a clear abuse of discretion, a reviewing court will not find reversible error unless manifest prejudice results. *People v. Hubbard* (1973), 55 Ill. 2d 142, 150-51, 302 N.E.2d 609; *People v. Hunter* (1984), 124 Ill. App. 3d 516, 538, 464 N.E.2d 659.

■ A review of the record here indicates no abuse of discretion in the trial court's ruling or prejudice to the defendant. While Kathleen Wolf testified on direct examination to conversations she had with defendant prior to the installation of listening devices on December 28, the line of questioning objected to by the State pertained to conversations with defendant which occurred after that date. Therefore, defendant's questions were beyond the scope of direct examination. Because Wolf did not testify on direct examination concerning conversations with defendant after December 27, there was no testimony concerning such conversations to explain, modify or discredit on cross-examination. (*People v. Patterson* (1980), 88 Ill. App. 3d 168, 175, 410 N.E.2d 396.) Defendant's argument that some other witness testified to events beyond December 27 does not avail him in an evaluation of the scope of this witness' direct testimony. We see no error in the restriction of cross-examination of this witness with respect to conversations with the defendant on dates not covered on direct examination. *United States v. Sorce* (7th Cir. 1963), 325 F.2d 84, 86, *cert. denied* (1964), 376 U.S. 931, 11 L. Ed. 2d 651, 84 S. Ct. 701.

■ Likewise, defendant argues that the two taped statements were relevant on the issue of Wolf's credibility and that he did not wish to have them admitted for the truth of the matters asserted. However, we do not believe the matters defendant wanted to bring out directly pertained to Wolf's bias, motive, or interest. In *People v. Britz* (1986), 112 Ill. 2d 314, cited by defendant, our supreme court held that recorded conversations between a counselor and defendant Britz were pertinent to the weight to be given to that defendant's later confession of a murder. This was so because the counselor, who had been coached by the police in conversational techniques aimed at eliciting information from Britz, had enticed Britz and had appealed to his masculinity in attempting to have him implicate himself in the crime. Consequently, the language of the counselor in the tape recordings was admissible for its effect on the listener and on his sub-

sequent confession.

The instant situation is inapposite to that in *Britz*. Here, the defendant's line of questioning was not directed to the issue of the effect of Wolf's questioning on defendant. Neither are we convinced from a review of the record that defendant's sole aim in questioning Wolf about the tape recordings was to impeach Wolf's credibility. Rather, defendant's emphasis on the allegedly exculpatory nature of the two statements he believes should have been admitted evidences a focus on the content of what he said in the conversations. We do not agree with the defendant that the statements, "I didn't do anything, you didn't do anything" and "I never went to the airport" are exculpatory or amount to denials. Further, these remarks were made after defendant was questioned about Kogelis' death, and, contrary to defendant's assertions, the record supports an inference that defendant may have suspected Wolf was involved in the police investigation. He arranged to call Wolf on the pay phone in the lobby of her apartment building, and only after calling her on that phone did he say that the body had been found. He said he wanted to meet with her but he told her he would arrange that meeting, one away from her apartment, by calling her at her work phone. After the police surrounded the motel he had chosen for the meeting, defendant went to Wolf's apartment but took her to a coffee shop for a conversation in which he warned her the police might try to trick her. Wolf also testified that defendant took from her the business card of Kelly Matthews, the same officer who had earlier questioned defendant about the murder.

In sum, we do not believe that the statements could have affected the trial court's belief in Wolf's truthfulness in relating the conversations testified to on direct examination. Since the statements were outside the scope of Wolf's direct examination, they were irrelevant and could not have been admitted to contradict Wolf's direct testimony. *People v. Kirkwood* (1959), 17 Ill. 2d 23, 30, 160 N.E.2d 766, *cert. denied* (1960), 363 U.S. 847, 4 L. Ed. 2d 1730, 80 S. Ct. 1623.

■ Finally, we are not persuaded by defendant's invocation of the doctrine of completeness. This principle permits a party to introduce the remainder of a conversation or a writing so as to correctly convey its true meaning to the trier of fact. (*People v. Williams* (1985), 109 Ill. 2d 327, 334, 487 N.E.2d 613.) Generally, the admissibility of that remainder must be limited to what was said on the same subject at the same time (7 Wigmore, Evidence sec. 2115, at 533 (3d ed. 1940)), and defendant has cited no cases in which the

rule has been applied to entirely separate conversations on separate dates. Even if we accepted defendant's argument that his statements, "I didn't do anything, you didn't do anything" and "I never went to the airport," relate to the conversations about which Wolf testified, we do not see how these statements convey a different, more true meaning to Wolf's testimony. As we have stated, we do not agree with the defendant that the existence of the statements makes it less likely that the incriminating statements were made, or that they in any way cause doubt as to Wolf's credibility. We conclude that the trial court properly ruled that the statements went beyond the scope of direct examination. We find neither an abuse of discretion nor prejudice to defendant in this case.

Defendant next urges that Wolf's testimony was insufficiently corroborated and inadequate to prove beyond a reasonable doubt that defendant was guilty of murder. After examining this evidence, we find that defendant's argument merely raises questions of credibility, which, in a bench trial, were within the province of the trial court to decide. (*People v. Martin* (1983), 112 Ill. App. 3d 486, 500, 445 N.E.2d 795.) The testimony of a single witness, if positive and credible, is sufficient to sustain a conviction even though the testimony is contradicted by the accused. (112 Ill. App. 3d 486, 500, 445 N.E.2d 795.) It is not the function of a reviewing court to reweigh facts and redetermine from the record the credibility of the witnesses. *People v. Zolidis* (1983), 115 Ill. App. 3d 669, 674, 450 N.E.2d 1290.

Moreover, the record does not support defendant's argument that there was no physical evidence corroborating Wolf's testimony. She testified that defendant said he returned to his yard after shooting decedent, pulled the body closer to the house and covered it with leaves. Matthews testified that he witnessed scrape marks on the body, and in court he identified these abrasions in photographs admitted into evidence. He also saw leaves and weed particles on the body and on decedent's clothes. The parties stipulated that this evidence was preserved and was compared to samples taken from the wooded area behind defendant's house. They agreed that, while laboratory testing indicated the general plant material was an insufficient sample for species identification, the testing revealed the leaves could have come from the same source. Wolf also testified that she first heard four or five shots. The body exhibited four bullet wounds. In light of the record, we cannot say that the trial court's findings, after considering the testimony of the witnesses and the circumstances surrounding the incident, were unreasonable or unsatisfactory.

■ The State concurs with defendant's next two contentions, which assert that the trial court erred in imposing judgment on two counts of murder where only one death was involved, and error in convicting defendant of armed violence where that offense was based on the commission of the murder. As to the first point, count I of the information alleged the intentional killing of Eugene Kogelis and count II alleged that the defendant acted with the knowledge that the shooting of Kogelis created a strong probability of death. Where only one man is murdered, there can be but one conviction. (*People v. Mack* (1984), 105 Ill. 2d 103, 137, 473 N.E.2d 880.) The sentence must be imposed on the most serious offense, and the intentional killing of Kogelis is the more culpable mental state of the two counts. (105 Ill. 2d 103, 137, 473 N.E.2d 880.) Therefore, the conviction on count I is affirmed and the conviction on count II is vacated.

■ The State likewise concedes the merits of defendant's request to vacate the armed-violence conviction since one cannot violate the armed-violence statute without first committing a felony, and alleging that felony has the effect of making it a necessarily included offense. (*People v. Donaldson* (1982), 91 Ill. 2d 164, 170, 435 N.E.2d 477.) Therefore, we vacate the armed-violence conviction. However, we need not remand the cause for resentencing on the offense of murder, because the trial court did not focus on the armed-violence count and appears not to have been improperly influenced by it in sentencing defendant to 40 years' imprisonment on count I of the murder charge. *People v. Castro* (1983), 114 Ill. App. 3d 984, 991, 449 N.E.2d 886.

■ Defendant also argues that it was improper to impose 40 years' imprisonment for a Class 3 felony of concealment of a homicidal death when the statute authorizes only from two to five years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(6).) The State's response that no sentence was imposed for this conviction and, thus, that it is not appealable is incorrect. Both immediately after closing arguments and in the mittimus, the trial court clearly found defendant guilty of concealment of a homicidal death.

■ We agree with the defendant that imposing 40 years' imprisonment for a Class 3 felony was error. However, this was not prejudicial error since the trial court had authority to impose a penalty of 40 years upon the count I murder charge and the sentences on the counts were to run concurrently. (*United States v. Foster* (7th Cir. 1958), 253 F.2d 457, 459.) Any good count sustained by the proof will support a general verdict (*People v. Jackson* (1961), 22 Ill. 2d 382, 390, 176 N.E.2d 803, *cert. denied* (1962), 368 U.S. 985, 7 L. Ed.

2d 523, 82 S. Ct. 600), although there are other counts upon which the sentence is found to be improper. In light of the trial court's error, however, we reduce defendant's sentence on the concealment of a homicidal death to five years.

Finally, defendant contends that the imposition of the maximum sentence was excessive in light of his prior work record and his minor history of criminal activity. We are not persuaded.

■■ ■ It is well settled that sentencing is within the discretion of the trial court (*People v. Almo* (1985), 108 Ill. 2d 54, 70, 483 N.E.2d 203) and will not be disturbed on review absent an abuse of that discretion (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 313, 475 N.E.2d 915). An abuse of discretion will be found only if the judgment of the trial court is manifestly unjust or palpably erroneous. (*People v. Anderson* (1986), 112 Ill. 2d 39, 46, 490 N.E.2d 1263.) Penalties are to be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. (Ill. Const. 1970, art. I, sec. 11.) Although rehabilitation is a factor which must be considered, it is not the sole factor and does not outweigh other considerations persuasive of a severe sentence. *People v. Branham* (1985), 137 Ill. App. 3d 896, 903, 484 N.E.2d 1226.)

■■ In the instant case the sentence was imposed upon the defendant after balancing several factors. The trial judge considered the extreme nature of a killing committed because decedent owed money to the defendant, but rejected the State's request for an extended-term sentence. The decision to sentence defendant to 40 years was not manifestly unjust or palpably erroneous; therefore, we find no abuse of discretion.

■■ We affirm the conviction of murder based on count I of the information, but vacate the murder conviction based on count II. We also vacate defendant's conviction for armed violence. Finally, we reduce defendant's sentence on conviction of concealment of a homicidal death to five years, which is the maximum for a Class 1 felony. As part of our judgment, we grant the State's request that defendant be assessed $75 as costs for this appeal.

Affirmed in part and vacated in part.

HARTMAN and SCARIANO, JJ., concur.