653 N.E.2d 1294 (1995)
274 Ill.App.3d 702
210 Ill.Dec. 832
In re A.M. et al., Minors (The People of the State of Illinois, Petitioner-Appellant,
v.
Filemon M. et al., Respondents-Appellees).
Nos. 1-95-0958, 1-95-1458.
Appellate Court of Illinois, First District, Fifth Division.
July 28, 1995.
*1296 Patrick T. Murphy, Lee Ann Lowder, Mary Kenney, Office of Cook County Public Guardian, Chicago, for appellants.
Ellen R. Domph, Chicago, for appellees.
Justice GORDON delivered the opinion of the court:
Petitions for adjudication of wardship were filed on behalf of minors A.M. and E.M. based on allegations made by the minors' seventeen-year-old sister, Rosa M., that their father had sexually abused her. At the adjudication hearing, Rosa recanted her prior statements. The trial court found the recantation credible and dismissed the petitions for adjudication of wardship. The Public Guardian and the State appeal from this dismissal.[1]
On appeal, the Petitioners argue that the trial court erred in refusing to allow impeachment of Rosa's in-court recantation. The Petitioners also argue that the decision to dismiss the petitions for adjudication of wardship was against the manifest weight of the evidence.
At the hearing, Detective William Stutzman of the Wheeling Police Department, testified that he interviewed Rosa on April 23, 1993. Rosa, who was seventeen years old, told him that two days earlier, she and her father argued about whether she could go to her prom. After the argument, her father kissed and hugged her, placed his hand on her breast on the outside of her clothing and then inside her shirt. Rosa told Stutzman that her father was always trying to hug her and touch her in ways she felt were inappropriate. Rosa also told Stutzman that, when she was fifteen years old, her father called her into his bedroom and told her to sit on his bed. He asked her whether she was sexually active, kissed her and placed his tongue inside her mouth. He fondled her on the outside and inside of her clothing. He pushed her back on the bed, removed her pants and underwear and inserted his finger into her vagina. During this incident, her father told her that he did not want her to date boys and that he was showing her what he did not want her to do with boys.
Detective Stutzman further testified that he interviewed Rosa's parents on April 23, 1993. Carmen M., her mother, cried and told him that two months earlier Rosa had informed her that her father kept wanting to hug her and tried to touch her "in that way." (On cross-examination, Stutzman admitted that his report indicated that Rosa's complaint to her mother was that her father was always hugging her and that she didn't want him to. There was no sexual reference in the report.) Carmen told Stutzman that she questioned her husband and that her husband denied touching Rosa in any wrongful way.
Detective Stutzman began his interview of the father, Filemon M., by advising him of his constitutional rights. Filemon indicated that he understood and signed a form to that effect. Filemon was informed of Rosa's statement and then told Stutzman that on April 21, 1993, he and Rosa argued about whether Rosa could go to her prom. At the end of the argument, he told Rosa to give him a hug and kiss and she did so. He admitted that his hands touched her breasts but he denied placing his hands beneath her shirt. With respect to the 1991 incident, Filemon told Stutzman that Rosa had come home with some marks on her neck. Filemon called Rosa into his bedroom, asked her whether she had any boyfriends and told her she was too young to date. He told her that he was going to show her what he did not want boys to do to her and then kissed her, placed his tongue in her mouth, touched her breasts on the outside and inside of her shirt, told her to lay down, pulled her pants and *1297 underwear off, and inserted his finger into her vaginal area.
On cross-examination, Stutzman admitted that Filemon spoke English with a Spanish accent. He also said there were no communication difficulties; Filemon responded to his questions; and Filemon never requested a Spanish interpreter. Stutzman stated that Filemon remained calm and was never agitated, angry or upset. Filemon's statement was not reduced to writing.
Doctor Sergio Grajeda, a therapist at Adalante, a treatment program for sex offenders specializing in Spanish-speaking clients, testified that Filemon admitted that he fondled his daughter's breast and crotch area but stated that he did so to sexually educate her. Doctor Grajeda also stated that Carmen told him that her husband told her that he had fondled Rosa because he was sexually educating her.
On cross-examination, Doctor Grajeda stated that Filemon indicated that his purpose in talking to Grajeda was to regain custody of his two children. Grajeda admitted that he told Filemon that he could not regain custody unless he took some responsibility for some of the allegations against him. Filemon thereafter admitted that he touched Rosa's breast and crotch area because he was educating her and wanted to tell her what she should not do with boys. Filemon indicated that he did this without any sexual intention and denied that he kissed Rosa on the mouth or that any digital penetration of Rosa occurred. Filemon told Grajeda that his actions had been misinterpreted.
On further cross-examination, Doctor Grajeda indicated that he was aware that Rosa had recanted her statements and did not press any criminal charges against her father because her prior statements were made when she was angry at her father since he would not let her go to the prom. On redirect, Doctor Grajeda stated that Rosa's recantation did not change his opinion that Filemon sexually abused Rosa.
After Doctor Grajeda's testimony, the State and the guardian for the minors rested. The respondents' motions for directed verdicts were denied.
Rosa, who was nineteen years old at the time of trial, was called to testify on behalf of Filemon. She testified that at the time she reported the sexual abuse to the police, she did not have a good relationship with her father. He was very strict and would not let her go out with her friends. She stated that she hated her father because he abandoned her and her mother until she was eight years old and because of all the restrictions he placed upon her. Rosa testified that on April 21, 1993 she and her father argued over whether she could go to the prom. She denied that her father kissed her, put his tongue in her mouth, or put his hand underneath her blouse.
Rosa stated that, after the argument concerning the prom, she wanted to hurt her father. She said she went to the police and told them that in 1991 her father touched her breast, kissed her and inserted his finger into her vagina. She testified that she was not truthful when she told the police this. Rosa further stated that in 1991 she had come home with a "hickey" on her neck and that her father saw it. She said he told her he "didn't want her doing anything bad with boys" and that he wanted to educate her. He pointed to her breast and her crouch area but did not touch her. She did not feel this was inappropriate nor did she feel that he was doing it to sexually arouse himself. Rosa further testified that her father did not insert his finger into her vagina, did not pull her pants down, did not kiss her on the mouth, and did not place his hand on top of her breast or underneath her blouse. She stated that her whole point in going to the police was to get family counseling with respect to communication between her parents and herself.
On cross-examination, Rosa admitted that on April 22, 1993 she told her friend that her father was doing something inappropriate. She stated that she told her high school psychologist that her father had touched her inappropriately. Rosa also admitted that on April 23, 1993 she told the police that her father had touched her breast on April 21, 1993 and that sometime in the fall of 1991 her father kissed her on the mouth, put his hands on her breast over and underneath her *1298 blouse, pushed her on the bed, pulled her pants down and stuck his finger in her vagina. She testified that she made that story up.
Rosa denied telling Sherrie Matthews-Huizar from Omni Youth Services that she was sexually molested by her father but that she was going to recant her story in criminal court because she did not want her father to be hurt. She reiterated that her whole point for counseling was to get better communication with her parents. She stated that she never wanted to see her parents get into trouble.
Filemon M. testified on his own behalf with the assistance of a court interpreter.[2] He stated that he went to the police station on April 23, 1993 and signed a paper written in English which he did not understand. He also stated that the police officer spoke to him in English and that there was very little that he understood. Filemon testified that the officer told him that Rosa made out a report that she had been abused and that, from what little he understood, he denied it. He also denied that he had touched Rosa's breast or personal parts. Filemon told the officer that the reason Rosa gave a statement was that they had had an argument two days before about Rosa's going to a party at school, having boyfriends, and lying to him. Filemon testified that after further questioning, he became angry, told the officer "I am lost," and, referring to Rosa's statement, told the officer to "put completely everything what is in the paper, whatever is in the paper. I don't care about anything." Filemon stated that, after this, he was not specifically questioned as to what was done with Rosa.
Filemon testified that he was surprised when he was arrested because he knew that nothing Rosa told the police was true. He stated that he did not tell or intend to tell the police that he had touched Rosa's breast or private parts. With respect to the incident involving the "hickey," Filemon told the police officer that he told Rosa that her body was for her own benefit and that she should not let any boyfriend touch her private parts. He pointed to her chest and crotch area for about two seconds. He denied having any intent to arouse himself or Rosa sexually and also denied touching her breasts, pulling her pants down or inserting his finger into her vagina.
On cross-examination, Filemon denied that he told Doctor Grajeda that he touched Rosa on her breast and in her crotch. He said that he showed Doctor Grajeda that he pointed at Rosa. He also said that Doctor Grajeda "interpreted things wrong" and that he and Doctor Grajeda did not understand each other even though they were both speaking Spanish. Filemon stated that, when he told Officer Stutzman to put down whatever was on the paper, he did not think he would get in trouble or that anything would happen.
After Filemon's testimony, his attorney rested. Carmen's attorney rested without presenting any witnesses. In rebuttal, the State called Sherry Matthews-Huizar, who in 1993 was a prevention specialist, youth and family counselor for Omni Youth Services. Matthews-Huizar testified that she counselled Rosa beginning in June of 1993 and met with Rosa three times a month for five to six months thereafter. Over defense objections, she testified that she had had a conversation with Rosa on October 5, 1993 and that Rosa told her that her father had sexually molested her. They discussed that fact in their following sessions. Matthews-Huizar testified that Rosa explained that she felt uncomfortable when her father hugged or touched her and that she felt it was not a man hugging his daughter but more like a man hugging a woman. Matthews-Huizar was not allowed to testify concerning her conversation with Rosa regarding Rosa's recantation and the reasons for her recantation.
At the conclusion of the hearing, the trial court found insufficient corroboration of Rosa's hearsay statements and dismissed the *1299 petitions for adjudication of wardship. In reaching this conclusion, the trial court found Rosa's in-court testimony to be forthright and credible and stated her recantation of her prior statements was strong.
On appeal, the petitioners first argue that the trial court erred in refusing to allow the State to impeach Rosa's in-court recantation with rebuttal testimony from Sherrie Matthews-Huizar. Before addressing the merits of petitioners' argument, we must first reach respondents' contention that the petitioners failed to preserve this issue by not making an offer of proof relating to the excluded evidence.
It is well settled that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court. (People v. Andrews (1992), 146 Ill.2d 413, 167 Ill.Dec. 996, 588 N.E.2d 1126.) As stated in People v. Andrews,
"[t]he purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence and to enable a reviewing court to determine whether exclusion of the evidence was proper. [Citation.]" 146 Ill.2d at 420-21, 167 Ill.Dec. at 1001, 588 N.E.2d at 1131.
An offer of proof is not required, however, when the circumstances and the question itself sufficiently indicate the purpose and substance of the evidence sought and when the question is in proper form and clearly admits of a favorable answer. (People v. Lynch (1984), 104 Ill.2d 194, 83 Ill.Dec. 598, 470 N.E.2d 1018; Wright v. Stokes (1988), 167 Ill.App.3d 887, 118 Ill.Dec. 853, 522 N.E.2d 308; Tolefree v. March (1981), 99 Ill.App.3d 1011, 55 Ill.Dec. 74, 425 N.E.2d 1247; M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 103.7, at 19 (5th ed. 1990).) A statement of counsel will suffice, particularly where there is no statement by the court, opposing counsel or by any other witness to dispute the remarks of counsel. Wright v. Stokes.
Here, Matthews-Huizar was questioned about a conversation she had with Rosa on October 5, 1993. After respondents' objected to this line of questioning, counsel for the State responded:
"When Rosa took the stand, I asked her if she had ever spoken to Miss Matthews about recanting, about the alleged molestation, and she testified she did not. What I'm trying to elicit from this witness is that in fact she had such a conversation."
We believe this statement by counsel adequately advises the court of the nature and character of the evidence sought to be introduced and that counsel's failure to make a formal offer of proof does not result in waiver.
At the adjudication hearing, the trial court sustained defense counsels' objections to Matthews-Huizar's rebuttal testimony because an insufficient foundation had been laid by the State during its cross-examination of Rosa and because Rosa had not been asked whether she told Matthews-Huizar that she was going to recant her statement.
Petitioners contend that Rosa was questioned on cross-examination about her conversation with Matthews-Huizar. They point to the following testimony that appears in the record:
"Q: Now, isn't it true, Rosa, that you told Sherrie Matthews Weissart [sic] that you were sexually molested, but you were going to recant your story in criminal court because you didn't want your father to be hurt?
A: No, I didn't tell her that. I told her my whole point for this counseling was to get better communication with my parents. That was my whole point for this.
Q: You never told Ms. Wiessart [sic] from Omni Youth Services
A: No.
Q: that you were sexually molested?
A: I never told her that."
Generally, to establish a proper foundation for impeaching a witness by a prior inconsistent statement, the witness must be asked about the time, place and circumstances of the statement in order to avoid unfair surprise and to permit her full opportunity for explanation. (E.g., People v. Coleman (1984), 124 Ill.App.3d 285, 79 Ill. *1300 Dec. 802, 464 N.E.2d 706.) However, where the questions propounded on cross-examination substantially satisfy the reasons for the rule, the conventional and formal foundation requirements need not be rigidly adhered to. People v. Henry (1970), 47 Ill.2d 312, 265 N.E.2d 876; see People v. McIntosh (1979), 70 Ill.App.3d 188, 26 Ill.Dec. 518, 388 N.E.2d 142.
In People v. Henry, the witness the defendant sought to impeach was asked on cross-examination whether she had a conversation with her aunt and others concerning the statement she had given to the police. She denied having the conversation and later claimed she did not remember having the conversation. The defendant then called two witnesses who would have testified, absent the court's grant of the State's objection, that such a conversation occurred and that during the course of that conversation the witness said she had been coerced by the police into giving her statement. The appellate court held that the trial court erred when it barred the testimony by the defendant's witnesses due to lack of a proper foundation. That court found that the foundation rule had been fulfilled because the witness had been afforded the opportunity to explain the alleged conversation and that her responses to the threshold questions made further inquiry into the matter a futile exercise.
In the case at bar, as in People v. Henry, the witness, Rosa, was asked on cross-examination whether she had a conversation with Sherrie Matthews-Huizar and whether she told Matthews-Huizar that she had been molested but that she was going to recant her statement because she did not want to hurt her father. Rosa recalled the conversation but denied making statements about the molestation and recantation. Rosa was afforded the opportunity to explain the alleged conversation, which she did, and also made a denial as to its content. Thus, the foundation rule was fulfilled by this scenario; and the trial court erred in barring Matthews-Huizar's rebuttal testimony on that basis. See also People v. Cobb (1983), 97 Ill.2d 465, 74 Ill.Dec. 1, 455 N.E.2d 31.
Petitioners next argue that the trial court committed error by prohibiting their cross-examination of Filemon regarding his prior arrest record. On direct examination by his own attorney, Filemon was asked whether he thought he was going to be arrested after he told the police to "put down whatever Rosa said happened." Filemon responded:
"A: Well, but I thought that we will, since I have never been arrested for anything in any way, I thoughtI completely thought it was some sort of education that they were giving me as to raising my children. But I never thought that, for example, that I'd be arrested."
On cross-examination, the State asked Filemon whether he had ever been arrested. Filemon's attorney objected on the basis that the question was beyond the scope of direct examination; but the trial court disagreed and allowed Filemon to answer the question. After Filemon answered negatively, the State asked whether he had been arrested for battery in 1978. Carmen's attorney then objected to the question because it was not clear that "the door ha[d] been opened" and because prior arrests were not admissible. In further support of her objection, counsel noted that even under the rule pronounced in People v. Montgomery (1971), 47 Ill.2d 510, 268 N.E.2d 695, precluding evidence of prior convictions older than ten years, the alleged arrest in 1978 was too old. The trial court sustained the objection.
Respondents contend that petitioners have waived any error regarding the barring of their cross-examination of Filemon because the State did not make an offer of proof concerning the nature of the excluded evidence. As discussed above, an offer of proof is not required where the question itself sufficiently indicates the purpose and substance of the evidence sought. (People v. Lynch; Wright v. Stokes; Tolefree v. March; M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 103.7, at 19 (5th ed. 1990).) In the case at bar, the State specifically asked the witness whether he had been arrested in 1978 on a battery charge. This statement adequately advised the court of the nature and character of the evidence sought to be introduced so that counsel's *1301 failure to make a formal offer of proof does not result in waiver. Accordingly, we must confront the issue of whether the trial court erred in excluding proof of defendant's 1978 arrest.
Ordinarily, a witness may be impeached by attacking his character with proof of conviction of a crime punishable by imprisonment of one year or more or proof of conviction of a crime that involves dishonesty or false statements. (E.g., Young v. Chicago Transit Authority (1990), 209 Ill.App.3d 84, 154 Ill.Dec. 18, 568 N.E.2d 18; People v. Moman (1990), 201 Ill.App.3d 293, 146 Ill.Dec. 897, 558 N.E.2d 1231.) The conviction may not be used if more than ten years has elapsed since the date of conviction or the date of release of the witness from confinement, whichever is later. (People v. Lawler (1991), 142 Ill.2d 548, 154 Ill.Dec. 674, 568 N.E.2d 895; People v. Montgomery.) For this purpose, only convictions may be proved, not arrests, indictments, or charges. (People v. Triplett (1985), 108 Ill.2d 463, 92 Ill.Dec. 454, 485 N.E.2d 9.) However, although evidence of arrest or indictment is not admissible to impeach credibility generally, it is admissible for other purposes such as to show that the witness' testimony may be influenced by bias, interest, or motive to testify falsely. (People v. Mason (1963), 28 Ill.2d 396, 192 N.E.2d 835; People v. Triplett.) The latitude to be allowed in cross-examination rests in the sound discretion of the trial court; and absent a clear abuse of discretion, a reviewing court will not find reversible error unless manifest prejudice results. People v. Collins (1985), 106 Ill.2d 237, 87 Ill.Dec. 910, 478 N.E.2d 267; People v. Hosty (1986), 146 Ill.App.3d 876, 100 Ill.Dec. 356, 497 N.E.2d 334.
In granting respondent's objection to the State's question, the court recognized that the year 1978 was more than ten years from the hearing date and also stated that "irrespective of whether there was a conviction, it is a proper objection." We disagree. The purpose of the State's cross-examination question was not to attack Filemon's character for truthfulness and veracity generally, wherein the People v. Montgomery rule would have applied so as to exclude evidence of the arrest. Rather, evidence of the arrest was sought to show that he understood the seriousness of the proceedings at the police station and knew that arrest was possible at the time he gave his statement, which constitutes an admission, to the police.
The respondents argue that the issue of Filemon's prior arrest was a collateral matter. We disagree. If a matter is collateral, it has no purpose other than to contradict (People v. Wadley (1988), 169 Ill.App.3d 1036, 120 Ill.Dec. 338, 523 N.E.2d 1249); and the cross-examiner may not impeach a witness on that matter and must accept the witness' answer. (People v. Collins.) As we noted, the issue of whether Filemon had a prior arrest is not a collateral matter because, in addition to contradicting his direct testimony, that testimony would have shown Filemon's state of mind at the time he gave his statement, an admission, to the police and also would have shown that he had knowledge of police proceedings and their ramifications which is of crucial significance in evaluating his prior admission to the police. See People v. Wadley (cross-examination of defendant regarding his prior arrest with two other individuals was not collateral because it showed defendant's relationship with a relative of those individuals that defendant denied knowing); see also People v. Collins (evidence shedding light on witness' ability to recall her activities with defendant during week of the murders was not collateral); see generally 1 John William Strong, McCormick on Evidence § 49, at 183 (4th ed. 1992) (matter is non-collateral if it is itself relevant in the litigation to establish a fact of consequence).
We also note that even if Filemon's prior arrest would have fit within the traditional characterization of collateralness, extrinsic evidence concerning that collateral matter would be admissible under the doctrine of "door opening." (See generally, 1 John William Strong, McCormick on Evidence § 49, at 187 (4th ed. 1992).) When a defendant chooses to testify in his own behalf, he places his credibility in issue; and when he introduces an issue on direct examination, though collateral to the issue to be proved, his statement may be attacked both *1302 on cross-examination and through rebuttal witnesses. People v. Ford (1987), 163 Ill.App.3d 497, 114 Ill.Dec. 611, 516 N.E.2d 766 (defendant's self-serving statement that he had never stabbed anyone could be rebutted with testimony that defendant told witness he had committed a stabbing); People v. Johnson (1976), 42 Ill.App.3d 194, 355 N.E.2d 577 (defendant's objections to cross-examination concerning his prior arrests correctly overruled because direct examination concerned that issue).
In view of the trial court's erroneous evidentiary rulings precluding evidence from a rebuttal witness concerning Rosa's prior inconsistent statement and evidence concerning Filemon's prior arrest, the question becomes whether the errors resulted in manifest prejudice so that reversal and remand are required.
Contrary to the respondents' contentions, we do not find these errors to be harmless. It is true that under traditional rules of evidence a witness' prior inconsistent statement is admissible only to attack his credibility and cannot be admitted as proof of the substance of the statement. (People v. Collins (1971), 49 Ill.2d 179, 274 N.E.2d 77; People v. Koch (1993), 248 Ill.App.3d 584, 188 Ill.Dec. 77, 618 N.E.2d 647; see generally 1 John William Strong, McCormick on Evidence § 34, at 113 (4th ed. 1992).) Although the prohibited testimony of Matthews-Huizar went to Rosa's credibility, it was Rosa's credibility that played a key role in the trial court's decision to dismiss the petitions for adjudication of wardship. Matthews-Huizar's testimony that Rosa said she recanted her statement to the police because she did not want to hurt her father directly contradicted Rosa's in-court testimony that she recanted her statement because it wasn't true and because the statement to the police was made in order to obtain family counselling. The prior inconsistent statement would have been significant in judging Rosa's credibility of her in-court testimony with which the previous statement is inconsistent. See 1 John William Strong, McCormick on Evidence § 34, at 114 (4th ed. 1992).
Similarly, evidence refuting Filemon's direct testimony that he had never been arrested before and that he did not think he would be arrested when he gave his statement to the police would have been influential in weighing Filemon's in-court testimony and refuting his admission as well as evaluating the impact of his out-of-court admission. That testimony included denials by Filemon that he understood the questions posed to him by the police; and that testimony contradicted testimony by the State's witnesses, Detective Stutzman and Doctor Grajeda, that Filemon admitted to them that he committed the acts alleged by Rosa. Since the trial court found a lack of "sufficient corroboration of Rosa's hearsay statements" (see 705 ILCS 405/2-18(4)(c) (West 1992)), the court obviously disregarded Filemon's prior admissions, which were highly damaging, believing instead that his in-court testimony was more credible.
The evidence in the instant case consisted of prior statements and admissions which were repudiated and denied at trial. A determination of the credibility of the witnesses was critical to the resolution of the conflicting and contradictory evidence. Exclusion of testimony crucial to that credibility determination constitutes reversible error. (See People v. Collins (1985), 106 Ill.2d 237, 87 Ill.Dec. 910, 478 N.E.2d 267; People v. Hosty.) Therefore, a reversal and remand are required.
In view of the reversal and remand, we need not address the petitioners' third argument that the decision to dismiss the petitions for adjudication of wardship was against the manifest weight of the evidence.
For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause is remanded for further proceedings consistent with this opinion.
Reversed and remanded.
McNULTY, and THOMAS J. O'BRIEN, JJ., concur.
NOTES
[1] The State has adopted the brief submitted by the Public Guardian and, for purposes of this opinion, they will be referred to collectively as the Petitioners. The Respondents filed a consolidated brief, and unless specifically identified, will be referred to collectively as the Respondents.
[2] During cross-examination, the State asked that the record reflect that Filemon answered certain questions before they were translated to him by the interpreter. (See S.R. 64, 72) At the conclusion of the hearing, the trial court also found that Filemon had an understanding of the English language, despite his pronouncements to the contrary, and that this was observable while Filemon was being questioned on the stand. (R.C. 164)