THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHARLES J. WILLIAMS, Defendant-Appellant.
First District (1st Division)   No. 81—1543

Opinion filed March 7, 1983.—Rehearing denied March 28, 1983.

Steven Clark and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Ramond Brogan, and Sara Dillery Hynes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McGLOON delivered the opinion of the court:

Charles Williams and Ronald Acklin were charged by indictment with the murder of Barry Nance. After a separate jury trial, defendant Charles Williams was found guilty and sentenced to 60 years in the Illinois Department of Corrections. Williams appeals.

On appeal, Williams contends (1) he was not proved guilty beyond a reasonable doubt; (2) evidence of bias on the part of two witnesses was improperly excluded; (3) the trial court erred in permitting the State to use prior statements of a witness for impeachment; and (4) photographs were improperly admitted into evidence.

We affirm.

At trial, the victim's mother Naria Nance testified that on January 3, 1979, at 12:15 a.m., her son Barry told her he was going to his girlfriend's house. When Barry left, he was wearing a cranberry suit, multicolored shirt, high tan boots, two pairs of socks, a corduroy jacket, green trench coat, and a beret. She next saw her son's body on January 8, 1979, at the Cook County Morgue.

Chicago police officer Lawrence Dunne testified that after receiving a radio order on January 5, 1979, he went to an alley behind 12326 South Normal Avenue. He saw a large bundle of blankets atop a garbage can. Upon opening a corner of the bundle, he discovered the victim's body. Officer Dunne identified four photos of the blanket-wrapped corpse.

Dr. Robert Stein, chief medical examiner of Cook County, performed the autopsy on Barry Nance. He testified the body was wrapped in plastic and two blankets. The victim's ankles were bound with wire. A bicycle inner tube was tied around his knees and neck causing the deceased to lie in a fetal position. The body was clothed in blue jean shorts, a sweater, two pairs of socks and undershorts. Dr. Stein's examination revealed that the victim had received head injuries inflicted by a blunt instrument. The blows to the head caused brain hemorrhages and contusions. A total of four lacerations appeared on the back, top and side of the head. There were numerous slash-like injuries on the victim's torso, arms and legs and the upper and lower jaws were broken. Dr. Stein further testified that all injuries were inflicted prior to his death. He attributed death to cranial cerebral injury and trauma in association with the broken jaw and incise wounds.

Frances Wright Acklin (hereinafter referred to as Wright) was called as a court's witness. She testified that on January 3, 1979, she resided at 12354 South Normal with her boyfriend Ronald Acklin, her nephew Denard Coats, and others. On this evening, defendant and the

victim came to her home and spent the evening in the basement with Acklin. Shortly thereafter, while she and her nephew were watching television upstairs, Wright heard falling and crashing noises emanating from the basement.

During the evening, Acklin received three phone calls from a woman living in Alabama. Wright answered each call and sent Coats into the basement to tell Acklin of the calls. For 45 minutes after Acklin answered the first call, Wright heard loud noises coming from the basement. While Acklin was engaged in the second conversation, Wright heard defendant and the victim arguing. When Acklin returned to the basement, she heard him say, "That is enough, leave him alone, let him up." After the third phone conversation, Acklin remained upstairs to eat. When he returned to the basement, he yelled to Wright that someone had been taken home. Wright could not recall exactly what Acklin said.

Two minutes later, Acklin came upstairs and said he had to clean the basement. Ten minutes thereafter, Wright saw defendant in the living room. She had not seen him walk up from the basement and believed Coats had let defendant in through the front door. Wright then explained the basement had a door which led to the back yard.

Wright further testified that the ax, meat cleaver, club and mason's hammer found by the police were owned by no one in particular and belonged to the house. She could not recall telling Officer Bennett that at about 1 a.m. on January 4, 1979, Acklin told her he and defendant were going to walk the victim home and that five minutes later, defendant and Acklin entered the house through the front door.

During examination by defense counsel, Wright testified she never saw blood in the basement. Until police came to her house, she was unaware that boots worn by the victim were in the basement. She slept in the basement bedroom on the morning of January 4, but did not notice the condition of the basement because the lights were off.

Denard Coats, also called as a court's witness, testified that when the victim arrived at his home on the evening in question, he was wearing boots which he had borrowed from Coats on New Year's Eve. After defendant and the victim went into the basement, he heard an argument concerning an ashtray which had been spilled. Forty-five minutes later, Acklin received a phone call and Coats went to tell him. Acklin and the two other men were in the basement bedroom. When Coats went into the basement to tell Acklin of the second call, he noticed blood near the bottom of the bedroom door. Coats further testified that while Acklin was engaged in the second conversation, he heard the victim and defendant arguing. The victim said, "Please

don't kill me, please don't kill me." Coats told Acklin about the victim's pleas, and Acklin returned to the basement. Coats heard Acklin say, "Let him up." Coats also told Acklin of the third phone call. The men were in the bedroom and no one was in the main basement area. Acklin remained upstairs to eat after the third phone call and then went back to the basement. When Acklin came upstairs shortly thereafter, he said defendant and the victim had gone home. Acklin then said he was going to clean the basement. Three minutes later, defendant came in the front door.

Coats was also questioned about statements he made to the police. He could not recall stating that after the third phone call, he saw defendant and Acklin with what appeared to be a body and a blanket, that he saw a bloody ax and blood on the floor, that he saw defendant and Acklin dragging a blanket-wrapped object out through the basement door, and that Acklin had asked him to clean a bloody ax.

Detective Thomas Bennett investigated the Barry Nance murder. He testified that on January 8, 1979, he and his partner went to the home at 12354 South Normal and were admitted by Frances Wright. She took the officers to the basement where Bennett observed blood stains on the floor and a chair. Bennett also found blood-stained wire, a three-foot ax, a two-foot club, and blood-stained bottles. On the main floor of the house, Bennett recovered a meat cleaver and mason's hammer under the garbage in the kitchen. The items were in a plastic bag. Outside the house, Bennett found drag marks in the snow leading from the back entrance to the alley. He also testified to statements made to him by Wright and Coats, which Wright and Coats could not recall at trial.

After hearing the evidence, the jury returned a verdict of guilty on the charge of murder.

■ First, defendant contends the testimony of Wright and Coats was incredible and thus he was not proved guilty beyond a reasonable doubt. Defendant cites the following instances to support his argument: (1) Acklin answered the telephone calls upstairs, even though there was a phone in the basement; (2) Coats testified he did not see anyone in the main area of the basement, yet police found evidence of the crime there; (3) Wright did not see blood in the basement when she went to bed on the evening in question; (4) the witnesses failed to inspect the basement after Coats heard the victim plead for his life. Additionally, defendant argues that Wright's bias in favor of Acklin (her husband at the time of trial) renders her testimony incredible.

We do not agree that the alleged infirmities in the witnesses' testimony create a reasonable doubt of guilt, particularly in view of the

other evidence presented at trial. At best, they raise questions of credibility which are matters for resolution by the jury. (*People v. Warmack* (1980), 83 Ill. 2d 112, 413 N.E.2d 1254; *People v. Miller* (1980), 79 Ill. 2d 454, 404 N.E.2d 199.) Furthermore, the jury was aware of Wright's possible bias and undoubtedly took this factor into consideration.

■ Second, defendant contends the trial court erred in prohibiting his examination of Wright and Coats regarding their testimony during Acklin's trial. We have reviewed the pertinent parts of the trial transcript and found that defendant was allowed to question the witnesses about their prior testimony. The trial court only prohibited defendant from referring to the guilty finding in Acklin's trial and to the fact that Acklin was the defendant in that trial. Thus, it is clear that counsel's request to use the prior testimony was in fact granted and the issue raised on this point is unwarranted.

■ Third, defendant contends the trial court erred in allowing the State to use for impeachment purposes Coats' statements to Officer Bennett which incriminated defendant. As noted in the facts of this case, Coats could not recall telling Bennett that he saw Acklin and defendant with a blanket-wrapped bundle, that they dragged the bundle out of the basement, that he saw the bloody ax and that Acklin asked him to clean the ax. When the prosecution examined Officer Bennett, he testified that Coats had made these statements. Defendant argues that no foundation was laid for the introduction of the statements through Bennett and that the statements were used improperly as substantive evidence.

A proper foundation for using a prior statement for impeachment consists of informing the witness sought to be impeached of the time, place, circumstances, and substance of the statement and persons present when the statement was made. (*People v. Sanders* (1974), 56 Ill. 2d 241, 306 N.E.2d 865, *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1143, 94 S. Ct. 3178; *People v. McIntosh* (1979), 70 Ill. App. 3d 188, 388 N.E.2d 142.) In the case at bar, the record clearly reveals that a proper foundation was established. Coats was asked about the time, place, persons present, and substance of his statements. Furthermore, we cannot agree that the prosecution attempted to use Coats' prior statements as substantive evidence as it did not dwell at length on the contents of the statement nor refer to the statement during closing arguments as evidence of guilt. Also, the trial court instructed the jury that Officer Bennett's testimony regarding the statement was to be considered only for impeachment and not as proof of guilt. Thus, we find no error in this aspect of the trial.

54

■ Finally, defendant contends prejudicial error occurred when the trial court admitted into evidence several photographs of the victim's body.

Fourteen photographs were admitted during trial. Four of the photos depicted the blanket-wrapped corpse atop the garbage can in the alley. Defendant did not object to the admission of these photos and thus any objections concerning these are deemed waived. *People v. Eckles* (1980), 83 Ill. App. 3d 292, 404 N.E.2d 358.

Regarding the admission of the remaining 10 photos, we initially note that the admission of photographs is a matter within the sound discretion of the trial court. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6; *People v. Stocks* (1981), 93 Ill. App. 3d 439, 417 N.E.2d 1080.) Photographs are admissible despite their gruesome nature if they are probative of the cause of death, depict the amount of force used in the crime, or tend to corroborate or not corroborate the testimony of the pathologist or other witnesses. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; *People v. Stocks.*) Here, two of the photos were of the corpse wrapped in the blanket. They were not gruesome and thus had no prejudicial effect. The remaining eight photographs depicted various parts of the victim's mutilated and battered body. Several are gruesome and shocking, but each photo is relevant to the issues on the cause of death and the degree of force used in the murder. They are particularly relevant to the latter issue because they show that virtually no part of the victim's body was left unscathed by the perpetrators of the offense. Additionally, the photos corroborate the testimony of Dr. Stein. We, therefore, find no abuse of discretion in the admission of the photographs.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

O'CONNOR and CAMPBELL, JJ., concur.