THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD ACKLIN, Defendant-Appellant.

First District (4th Division)   No. 1—80—2320

Opinion filed December 31, 1990.

Michael J. Pelletier and James Chadd, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Marilyn F. Schlesinger, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

After a jury trial, defendant, Ronald Acklin was found guilty of murder (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a)(1), (a)(2)) and concealment of a homicidal death (Ill. Rev. Stat. 1979, ch. 38, par. 9—3.1). Finding the crimes committed to be exceptionally brutal and heinous indicative of wanton cruelty, defendant was sentenced to life imprisonment.

On appeal, defendant raises the following issues: (1) whether he

was proved guilty beyond a reasonable doubt; (2) whether he was denied a fair trial when the State revealed prior inconsistent statements made by two witnesses; (3) whether he was denied a fair trial when the State made certain arguments allegedly not supported by the evidence; (4) whether his sentence must be reduced due to the disparity in sentencing between him and his codefendant, Charles Williams; (5) whether one of the two murder counts must be vacated; and (6) whether he was improperly sentenced to natural life imprisonment.

We affirm in part and vacate in part and modify.

At trial, the evidence established that on January 5, 1979, the frozen body of Barry Nance was found on top of a garbage can in an alley in Chicago. The body had been wrapped in plastic and two blankets. The victim had sustained numerous marks of violence to the body, including a fractured jaw, severe lacerations indicative of tears made to the body by a blunt instrument, and incised wounds indicative of cuts made to the body by a sharp instrument. It was determined that the cause of death was due to a severe cranial cerebral injury, in association with a compound fracture of the jaw, and numerous wounds to the body. At the time of death, Barry Nance was 21 years of age.

On January 3, 1979, at approximately 10 p.m., Williams and Nance arrived at defendant's house. Defendant, at that time, was living in a basement apartment with his girlfriend, Frances Wright. The house was owned by Frances' sister, Nancy. Nancy also resided in the house with her five children, including Dennard Coats. Defendant, Nance and Williams remained in the basement, while Frances and her nephew, Dennard, went upstairs to put the younger children to bed and to watch television.

Frances testified that while watching television, she heard "loud talking, banging into things [and] so forth" emanating from the basement. This continued until defendant received a telephone call, approximately 15 minutes after the fracas had begun in the basement. The telephone call that defendant received was concerning a woman in Alabama who was expected to give birth, imminently, to his child. According to Frances, defendant conversed with the woman or the woman's sister approximately 15 or 20 minutes. The call was taken in the upstairs kitchen.

Defendant then returned to the basement and, shortly thereafter, another argument ensued. Approximately 30 minutes later, defendant received a second telephone call regarding the impending birth of his child. This conversation also lasted 15 minutes. Frances testified that defendant then "ran back downstairs all of a sudden, and [she] heard

some shouting, and [she] heard Ron say leave him alone, let him up." Williams then made a derogatory remark. For the next 90 minutes it became quiet in the basement.

Defendant then received a third telephone call. He was informed that the woman in Alabama had just given birth. After the call, defendant prepared some food which he ate while upstairs in the kitchen. When defendant finished eating, he went back downstairs to the basement. He then announced that Nance and Williams must have gone home. As Frances did not see Nance and Williams leave, she inferred that they left the premises through the basement door.

Defendant then told Frances to make some coffee while he straightened up the basement. Defendant remained in the basement for five minutes before coming upstairs. Approximately one minute later, Williams entered the kitchen through the living room on the first floor of the house.

Defendant and Williams drank coffee and then Williams left the house. Frances and defendant then retired to their basement apartment. Frances testified that she noticed a liquor bottle on the floor of the basement and that the basement was "kind of messy."

Dennard Coats testified that he heard the three men arguing in the basement about an ashtray. He heard both defendant and Williams tell Nance to pick up the ashtray. When Dennard went downstairs to inform defendant that he had a second telephone call, he noticed approximately 15 or 20 drops of blood by the basement bedroom door. Dennard also testified that while defendant was talking on the telephone, he twice heard Nance plead for his life. Dennard immediately told defendant what he had heard. Defendant proceeded to hang up the telephone and ran downstairs to the basement. Dennard testified that he also heard defendant tell Williams to "[l]et him up."

Subsequently, Dennard went back downstairs to tell defendant that he had a third telephone call. Dennard heard defendant and Williams talking but he did not hear Nance. Dennard also testified that he observed defendant and Williams drinking coffee prior to Williams' departure. He did not, however, see Nance leave the house.

Chicago police officer Thomas Bennett testified that he arrived at defendant's house on the afternoon of January 8, 1979. Upon entering the basement, Officer Bennett observed a bloodstained chair; bloodstained boots; three liquor bottles with blood on them; a pair of panty hose with embedded bone particles in them; a pair of gloves and a man's shirt found in a hole in the basement floor; a bloodstained ax; bloodstained wire cords; bloodstained sanitary tubs and a tray; and a bloodstained wrench. A meat cleaver and Mason hammer were found

in the kitchen wrapped in plastic underneath a bag of garbage. At trial, Officer Bennett identified a picture of the yard in the back of defendant's house. The picture revealed depressions in the snow which either began or terminated at the back door of the basement.

Officer Bennett also testified that Frances told him that defendant informed her that he and Williams were going to walk Nance home; that the parties left by the basement door as she did not see them leave; that defendant and Williams both came back into the house through the front door; that defendant was wearing Nance's gloves; and that she saw a meat cleaver on the dresser in the basement bedroom.

According to Officer Bennett, Dennard told him that defendant had ordered him to wipe the blood from an ax; that he had seen blood all over the basement and what appeared to be a body wrapped in a blanket; and that he had observed defendant and Williams dragging the wrapped body out through the basement door.

After hearing all of the evidence, the jury found defendant guilty. He was sentenced to a term of natural life. Williams was sentenced to 60 years' imprisonment. Williams' conviction was affirmed in *People v. Williams* (1983), 113 Ill. App. 3d 49. Defendant filed a timely notice of appeal but the case was dismissed for want of prosecution in October 1981. In 1988, this case was reinstated but dismissed a second time for want of prosecution in May 1989. This case was again reinstated in March 1990.

The first issue defendant presents is whether he was proved guilty beyond a reasonable doubt. Defendant argues that even when viewing the evidence in the light most favorable to the State it was not shown that he actually participated in the crime. Defendant maintains that he was talking on the telephone while Williams and Nance were arguing in the basement. He also contends that testimony from Frances and Dennard indicates that Williams and Nance were alone for a final time before they left defendant's house. Moreover, defendant contends that even if Nance was murdered at his house, only a suspicion would be created that he was involved but not that he was guilty of murder. We disagree.

■ Whether the evidence is direct or circumstantial, the standard for reviewing the sufficiency of the evidence in criminal cases is proof beyond a reasonable doubt. (*People v. Pintos* (1989), 133 Ill. 2d 286, 291.) The critical inquiry in determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a jury could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128

Ill. 2d 1, 49.) It is not the function of a court of review to retry the defendant. (*People v. Phillips* (1989), 127 Ill. 2d 499, 509.) It is the function of the trier of fact to determine the guilt or innocence of the accused; a court of review will not reverse the conviction unless the evidence is so improbable as to justify a reasonable doubt of guilt. (*Phillips*, 127 Ill. 2d at 509-10.) Determinations of credibility and weight given to the testimony of witnesses are exclusively within the province of the trier of fact. *People v. Collins* (1985), 106 Ill. 2d 237, 261-62.

■ The evidence presented in the instant case was not so unreasonable or improbable as to warrant reversal of this case. A review of the record in the light most favorable to the State reveals that Nance was tortured with various instruments. An ax, a hammer, a meat cleaver, and panty hose embedded with bone fragments were found in the house. A bloodied cord was found near a chair in the basement, leading to the inference that Nance may have been tied to the chair while being brutalized.

When the body was discovered, a rubber inner tube was wrapped around the deceased's neck and knees, rendering him into a fetal position. Linear incised wounds were found all over the deceased's body, including the upper and lower extremities, buttocks, and head area. Further, there is some question as to whether Nance was still alive when he was left atop a garbage can in below zero weather.

Frances testified that she did not actually see Nance leave. She was told by defendant that Nance had left with Williams. Dennard also testified that he had not seen Nance and Williams leave the house. Officer Bennett testified that he saw imprints in the snow leading to or from the basement door.

Dennard also testified that when he went to notify defendant of the second call, he noticed drops of blood by the basement bedroom door. Conceivably, Nance's brutalization had at least been in progress at that time. After this second call, Nance was still alive as Dennard heard defendant, Williams, and Nance arguing. When Dennard went downstairs to notify defendant of the third call, he did not hear Nance's voice. It is, therefore, not unreasonable or improbable for a jury to infer that the murder took place after the second telephone call while defendant was in the basement. Under the circumstances of this case, we find that the State proved defendant's guilt beyond a reasonable doubt.

■ Moreover, as the State notes, even though there was no direct evidence of the actual injuries defendant inflicted, defendant was tried under an accountability theory. A defendant may be held ac-

countable for an offense if he was aware of its commission even though there was no actual participation. (*People v. Jones* (1989), 184 Ill. App. 3d 412, 431; *People v. Scherzer* (1989), 179 Ill. App. 3d 624, 639.) "[T]he trier of fact may consider factors such as the defendant's presence during the crime, acts performed after the commission of the crime[,] and flight from the scene as evidence of accountability." (*People v. Williams* (1988), 176 Ill. App. 3d 73, 77.) The slightest evidence upon a theory of accountability would warrant giving the jury an accountability instruction. *People v. Jarvis* (1987), 158 Ill. App. 3d 415, 430.

■ In the instant case, we find that even assuming, *arguendo*, defendant did not participate in the commission of the crime, it is not unreasonable to infer that, at the very least, he was present and did not prevent the incident from occurring. Furthermore, as the State notes, defendant did not notify the authorities of Nance's brutalization and there was an attempt to conceal certain weapons later discovered at the house. We, therefore, find defendant's argument with respect to this issue without merit.

Next, defendant contends that he was denied a fair trial when the State used prior inconsistent statements to impart substantive evidence, rather than to impeach certain witnesses. Specifically, defendant refers to the testimony elicited from Officer Bennett concerning the statements made to him prior to trial by Frances and Dennard. Contrary to Frances' in-court testimony, she informed Officer Bennett that defendant said that he and Williams were going to escort Nance home; that all three men left by the basement door; she saw defendant wearing Nance's gloves when he and Williams returned to the house; and that she saw a meat cleaver and a hammer on her dresser in the basement the following morning.

At trial, Frances testified that defendant told her that Williams must have taken Nance home and that defendant remained with her at the house until they retired. There was no testimony that she saw defendant wearing Nance's gloves or that she found a meat cleaver in the basement.

Dennard's testimony was also impeached. He informed Officer Bennett that defendant told him to wash blood from an ax; that he saw blood everywhere in the basement and a body wrapped in a blanket in the basement; and that defendant and Williams dragged the body out of the house through the basement door. Defendant also notes that the State, in closing argument, pointed out the discrepancies between the direct testimony and the prior inconsistent statements of Frances and Dennard.

■ Prior inconsistent statements are admissible for the limited purpose of impeachment. (*People v. Smith* (1984), 102 Ill. 2d 365, 374.) Although the credibility of a witness may now be attacked by any party (87 Ill. 2d R. 238), at the time of trial the long-standing rule prohibiting the impeachment of one's own witness was still in effect. (*People v. Nowak* (1979), 76 Ill. App. 3d 472, 478.) Frances and Dennard were, therefore, called as the court's witnesses. "Where a witness has testimony material to the issue, where his veracity is questionable, and where there might otherwise be a miscarriage of justice, the court may call that witness as a court's witness. *** A court's witness may be impeached as any other witness." (*People v. Pastorino* (1982), 91 Ill. 2d 178, 191.) The purpose of impeachment is to adversely affect witness credibility not to impart or establish the truth of the impeaching evidence. *People v. Bradford* (1985), 106 Ill. 2d 492, 499.

The court's decision to allow the State to call these witnesses as court witnesses is not challenged by the parties. Defendant argues that their testimony was elicited under the guise of impeachment but the actual purpose was to impart the prior inconsistent statements to the jury as substantive evidence. We disagree.

■ Prior to the witnesses' testimony, the court granted defendant's motion to limit the testimony to only those matters which directly related to the alleged inconsistencies and that the jury be admonished that the statements were being admitted for the limited purpose of impeachment. The court then proceeded to admonish the jury on three separate occasions. Where the impeachment is not extraordinarily long or repetitious and the court clearly cautions and instructs the jury to limit its consideration of the impeachment, the jury may consider such evidence. (*People v. Paradise* (1964), 30 Ill. 2d 381, 385.) We are not persuaded that the impeachment was improper or that it was used as substantive evidence, as the impeachment was not extremely repetitious and the court admonished the jury three different times.

Moreover, even assuming, *arguendo*, there was error in allowing the impeachment, we do not find the elicited testimony to be pivotal in finding defendant guilty. As previously determined, the evidence was sufficient to warrant a finding of defendant's guilt beyond a reasonable doubt notwithstanding the witnesses' inconsistent statements.

Next, defendant contends that he was denied a fair trial when the State, in closing arguments, made certain remarks which were not supported by the evidence presented at trial. Defendant refers to the portions of the State's argument that Nance's blood type matched the

blood found on certain items in the house, including an ax. This argument was based upon the stipulation of a crime analyst which consisted of descriptions of the items found in the house and the blood type found on each of the items. However, defendant argues that the State did not establish a chain of custody that the items tested were the same items found in the basement.

■ We find defendant's contention to be without merit, as he agreed to the stipulation without objection. Further, defendant did not object to the State's comments concerning this issue when made during the closing arguments. This issue is, therefore, waived. *People v. Enoch* (1988), 122 Ill. 2d 176, 186-88.

■ Defendant also now challenges the State's remarks during closing arguments concerning a call made to the police informing them of the location of Nance's body. Defendant contends that it was improper for the prosecution to infer that the call was made from someone who was in defendant's house. Although the inference may be tenuous given the facts presented at trial, defendant failed to object when these remarks were made. This issue, therefore, is also waived for our consideration. *People v. Enoch*, 122 Ill. 2d at 186-88.

The fourth issue defendant raises is whether his sentence must be reduced to 60 years due to the disparity in sentencing between defendant and Williams. Williams was sentenced to a term of 60 years' imprisonment. Defendant was sentenced to a term of natural life. "The Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences." (*Williams v. Illinois* (1970), 399 U.S. 235, 243, 26 L. Ed. 2d 586, 594, 90 S. Ct. 2018, 2023.) This court will not alter the sentence imposed by the trial court absent an abuse of discretion, even though we may have imposed a different sentence. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153.) A trial court's decision in the sentencing of a defendant is entitled to great weight and deference. *People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93.

Defendant does not contend that the trial court abused its discretion in finding the crime indicative of wanton cruelty which would warrant a life sentence. Defendant argues that the disparity in sentencing was unwarranted. Defendant reasons that because Williams had a more significant criminal history, the trial court improperly gave him the greater sentence. Defendant alleges that he had only one prior criminal conviction, whereas Williams had three prior convictions. As the State points out, this is simply not true; defendant had four prior convictions.

■■ Defendant also argues that the court's finding, at sentencing, that Williams was not the "prime mover" and therefore received the lesser sentence, is unsupported by the record. The court, however, explained that its conclusion was based upon the evidence. An arbitrary disparity in sentences is impermissible. (See *People v. Kline* (1982), 92 Ill. 2d 490.) After reviewing the record, we do not find that this decision was reached arbitrarily so as to warrant reduction of defendant's sentence. We will, therefore, defer to the court's decision with respect to this issue.

■■ Defendant next contends that one of the two murder counts must be vacated. The State concedes that defendant should have been convicted on only one count of murder. We agree. There was ample evidence to support defendant's conviction on both of the murder charges. However, where there is the murder of only one person, there can be only one conviction. (*People v. Mack* (1984), 105 Ill. 2d 103, 136-37.) Therefore, the murder conviction (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)) for intentionally and knowingly killing Nance will be affirmed. The other murder conviction (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2)) will be vacated. (See *Mack*, 105 Ill. 2d at 137.) This does not, however, warrant a reduction in defendant's sentence.

■■ Finally, defendant claims that he must be granted a new sentencing hearing as he was improperly sentenced to a term of natural life for the offense of concealment of a homicidal death. The State also concedes that the order of sentence incorrectly states that the life term was imposed for both murder and concealment. We, therefore, find that the order of sentence must be modified. 87 Ill. 2d Rules 615(a), (b)(1).

For the foregoing reasons, we affirm defendant's conviction, on the single count of murder, and his sentence; we vacate one of the murder counts; and we modify the order of sentence to reflect that a life term is imposed for the one murder count only. As part of our judgment, we grant the State's request that defendant be assessed $75 as costs and fees for this appeal pursuant to *People v. Agnew* (1985), 105 Ill. 2d 275, and *People v. Nicholls* (1978), 71 Ill. 2d 166.

Affirmed in part; vacated in part and modified.

LINN and JIGANTI, JJ., concur.