THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ZYGMUNT KOCH, Defendant-Appellant.

First District (2nd Division)    No. 1—92—1649

Opinion filed June 15, 1993.

John M. Carey, Jr., of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Robin M. Mitchell, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Zygmunt Koch was charged by information with nine counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, pars. 12—14(a)(1), (a)(3), (a)(4)), three counts of criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—13(a)(1)), two counts of kidnapping (Ill. Rev. Stat. 1991, ch. 38, pars. 10—1(a)(1), (a)(2)), and one count of aggravated unlawful restraint (Ill. Rev. Stat. 1991, ch. 38, par. 10—3.1(a)). Prior to trial, the State nol-prossed the two kidnapping counts and, after choosing to be tried by the court sitting without a jury on the remaining counts, defendant was found guilty of three counts of aggravated criminal sexual assault and was sentenced to eight years in the custody of the Illinois Department of Corrections.

The following evidence was adduced at defendant's trial. On July 21, 1991, at approximately 11 p.m., the victim, A.K., was watching television when she heard her dog bark. Upon looking out her window, she observed defendant, whom she had previously met at a party hosted by a mutual friend, standing just outside the window. At the party, A.K., a part-time salesperson for a cosmetic company, had informed defendant of the line of cosmetics available for men, and on a later date he had gone to her home to place an order with her. When she saw him again on July 21, she inquired why he was there,

and he responded that he had come to retrieve his cosmetics order. A.K. did not indicate whether or not she had previously asked defendant to pick up his order or even that defendant's cosmetics were, in fact, available on the night in question.

After A.K. invited defendant into her home, the two conversed while sitting on the couch in her living room, and after a while, he closed the distance on the couch which had separated them. Soon he embraced her, whereupon she asked him to stop and leave her home. Rather than complying with her plea, defendant kissed her cheek, and when she again rebuffed his advances, he withdrew a gun from his pocket, removed its clip and showed her that it contained live bullets in order to convince her that it was not a toy, and advised her that the safety was disengaged. He ordered her to stop crying and to "kiss him like she kisses her boyfriend." He then led her into the bedroom, instructed her to disrobe and to lie down on the bed. While keeping the gun aimed at her, he removed his clothing, and after fondling her, he had sexual intercourse with her. Thereafter, he performed cunnilingus and forced her to perform fellatio.

After a short respite, he again forced her to engage in vaginal and oral intercourse, and after finishing, he instructed her to lie next to him while he rested. Thereafter, he arose and told her that he would be leaving. He threatened to kill her if she registered a complaint with the police or told anyone else of the incident, reminding her that he had a gun, and that in the event that he were arrested, he had friends who would kill her. He left her home around five o'clock on the morning of July 22.

She testified that she did not immediately call the police because she feared for her life and because she was not sure she would be able to describe the incident in even somewhat comprehensible English. She further testified that the first person whom she told of the assault was her boyfriend, John Mikrut, and that this conversation did not occur until much later that night. It was he who called the police, and with his help, she recounted the events of the evening, but all she could give them was defendant's first name. On cross-examination, she conceded that she spoke and understood some English and that after she learned defendant's last name, she was interviewed by a Chicago police detective without the benefit of an interpreter.

The State next called John Mikrut, who testified that he had been in a relationship with A.K. for about one year prior to the incident, and that on July 22, 1991, soon after his return from Wisconsin, he went to A.K.'s home. When he arrived, A.K. had visitors whom he also knew. He noticed that she was shaking and smoking heavily, and

that she was inordinately nervous. After their friend left with her young son, he inquired as to what was troubling her and, in response, she divulged the events of the night before.

After learning defendant's full name from A.K., Detective Robert Collins of the Chicago police department, who had been assigned to investigate her sexual assault complaint, obtained his address and went to his home in an attempt to speak with him. Defendant answered Collins' knock on the door by opening an upstairs window and leaning out. The detective advised him who he was and requested an opportunity to speak with him. Defendant indicated that he would be down and closed the window. A short time later, a woman answered the door and the officer gave her his card, requesting her to ask defendant to contact the police as they wanted to discuss with him an alleged sexual assault. He then went around to the back of the home and observed a rear entrance, but did not see defendant. Collins returned to the house once again that evening, but was informed that defendant was not there. He made repeated telephone calls to the home and left messages with his name and phone number, requesting that defendant phone him. On August 1, 1991, in the presence of his attorney, defendant surrendered himself to the police and was arrested. At the close of the State's case, the parties stipulated to the results of a serology test which concluded that a vaginal smear taken from the victim disclosed the presence of sperm and that a sample taken from her robe also contained sperm.

Defendant offered the testimony of Celina Kubicka, who recalled that on July 22, 1991, at approximately 7 A.M., she received a call from A.K. asking her for the last name of defendant and his address, telling her that he had just raped her. A.K. told her that defendant had come to her home the previous night and that he had a gun. She also related how she feared for her life because she believed defendant would kill her. Kubicka refused to give A.K. defendant's name or address because she did not think poorly of him. It was later stipulated that telephone company records showed that on the date and at the time in question, there was a call from A.K.'s phone to the number assigned to Ms. Kubicka's residence.

Defendant also took the stand and testified with the assistance of a Polish-speaking, court-appointed interpreter. He remembered that the first time he met A.K. was at a party held by Ms. Kubicka. The two exchanged names and addresses and defendant lent her some compact discs. A few days later, he visited A.K. at her residence, where the two engaged in consensual sexual relations and they again had sexual intercourse when he returned to her home a week later.

He testified that during his relationship with A.K., she had asked to borrow a total of $1,200 from him, explaining that she had no money and needed the funds in order to subsist. He gave her the funds because he was contemplating moving in with her, although at that time he lived with another woman.

On the evening of July 21, 1991, he notified A.K. that he would be visiting her in her home and he arrived there around midnight. A.K. answered the door wearing only a robe and offered him a drink which he thought contained alcohol. The two then engaged in consensual sexual intercourse for approximately two hours. After they finished, defendant requested another drink, which A.K. agreed to provide. When she did not return within five minutes, defendant arose from the bed and saw A.K. holding his pants. He went to her and checked his wallet, which he found to be missing $300. He accused A.K. of stealing his money, and when she denied it, he berated her and threatened to beat her and inform her friends that she was a prostitute. In response, she threatened to call the police and accuse him of raping her.

When asked, he estimated that he had had some form of consensual sex with A.K. on four or five separate occasions. He denied carrying a gun on the night of the incident and stated that, while he had threatened her that night, it was not to prevent her from calling the police, but to frighten her into repaying the money she had stolen.

He remembered that a few days after his money was stolen, a police officer came to his home, flashed a badge, and said something in English which he could not understand. He ordered his girl friend to answer the door and tell the officer that he was not home and then he left through the back door in order to retrieve someone who would translate for him and also because he did not want his housemate to know what had transpired with A.K. He voluntarily surrendered himself to police on August 1, 1991, after retaining an attorney, explaining that the delay was due to his need to gather the funds to pay the lawyer.

After the parties rested but before summations, the State informed the court that one of the appointed interpreters had mistranslated a part of defendant's response to a question asked in cross-examination, and she corrected her translation for the record. The parties then proceeded with closing arguments, after which the court found defendant guilty of three counts of aggravated criminal sexual assault and sentenced him to an eight-year term of incarceration. Defendant filed a timely notice of appeal.

I

Defendant's first assertion of error concerns the circuit court's considering as substantive evidence certain out-of-court declarations made by the victim and offered by defendant solely to impeach her credibility. The evidence complained of was the testimony of Celina Kubicka, who was called by defendant in order to contradict the averment of the victim that she did not call the police immediately after the attack because defendant had threatened to murder her if she told anyone and because she understood and spoke little English. A.K. had further testified that her boyfriend, John Mikrut, was the first person she informed of the assault, some 18 hours after it was perpetrated, and that it was he who phoned the police to report the incident. Kubicka, an acquaintance of both the victim and defendant, had refuted that testimony by informing the court that A.K. spoke to her a mere two hours after the assault wherein she notified her that defendant had raped her. Defendant contends that the trial court mistakenly ascribed substantive weight to this evidence and that its error contributed to his conviction. In response the State argues that defendant has waived the issue by failing to make a contemporaneous objection to the acceptance of the testimony into evidence, or, in the alternative, that, since defendant proffered Kubicka's testimony, he invited its admission into evidence and, therefore, is estopped from complaining on appeal.

We find the State's arguments unavailing. Under Illinois law, prior inconsistent statements may be offered solely for their impeachment value and may not be given substantive weight by the trier of fact. (*People v. Smith* (1984), 102 Ill. 2d 365, 374, 466 N.E.2d 236, 240, *rev'd on other grounds* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490; *People v. Acklin* (1990), 208 Ill. App. 3d 616, 624, 567 N.E.2d 525, 530, *appeal denied* (1991), 137 Ill. 2d 666, 571 N.E.2d 150.) In a case tried before a jury, defendant would have been entitled to an instruction (Illinois Pattern Jury Instructions, Criminal, No. 3.11 (3d ed. 1992)) in order to ensure that the jury would give no substantive weight to the prior inconsistent statement. (See *People v. Bradford* (1985), 106 Ill. 2d 492, 501, 478 N.E.2d 1341, 1345 ("This court, to reduce the risk that a jury might consider a prior inconsistent statement as independent evidence with substantive character, has held that a jury should be cautioned and properly instructed to limit its consideration of the statement to its narrow purpose"); *People v. Camp* (1984), 128 Ill. App. 3d 223, 231, 470 N.E.2d 540, 546.) The limiting instruction would allow defendant to gain the advantage of

impeaching the inconsistent portions of the witness' testimony without inadvertently bolstering that part of the testimony which was consistent with the earlier declaration. (*People v. Newman* (1964), 30 Ill. 2d 419, 424, 197 N.E.2d 12, 14; *People v. Robinson* (1984), 121 Ill. App. 3d 1003, 460 N.E.2d 392.) Since, in a jury trial, the instruction prevents the State from making substantive use of the prior inconsistent statement, assuming the defendant seeks the appropriate limiting instruction, his introduction of such evidence cannot be seen as constituting an invited erroneous admission of evidence.

Such an instruction is obviously unnecessary in a bench trial. Moreover, the trial judge is presumed to know the law, to apply it properly and to disregard all incompetent evidence. (*People v. Guest* (1986), 115 Ill. 2d 72, 503 N.E.2d 255; *People v. Pelegri* (1968), 39 Ill. 2d 568, 237 N.E.2d 453; *People v. Cruz* (1991), 224 Ill. App. 3d 425, 586 N.E.2d 658.) It also follows that defendant's reliance on the court's ability to discriminate between the proper uses of impeachment evidence obviated the need to make a contemporaneous objection to its use as substantive proof of defendant's guilt. At the time he offered the testimony, defendant had no cause to object to it, for he rightly assumed that it would only be considered for the purpose for which it was offered. Accordingly, we cannot agree with the State that defendant has waived this issue, nor will we hold him to have invited an error by proffering the impeaching testimony.

However, defendant does not convince that the trial court considered the evidence for anything other than its proper purpose, *i.e.*, how it affected the court's assessment of the victim's credibility. While rendering its judgment, the trial court reviewed the evidence presented at trial and when it reached the testimony of Ms. Kubicka, it stated:

"The Defense also presented Salina [*sic*] Kubicka who was the lady that brought these two [A.K. and defendant] together initially at her home in May who testified as to additional outcry who had not been brought forth by the State in their presentation of the complaining witness which I suppose can be viewed two ways. One is additional corroboration of the sexual assault which is basically what Ms. Kubicka testified to because there was nothing inconsistent with her testimony as to what [A.K.] had said and the inconsistency, therefore, being in whether or not this was an additional person whom she had talked to or whether John Macrute [*sic*] was the only person besides the police who [A.K.] had talked to.

Be that as it may, the Court has listened carefully to the evidence and had evaluated the respective positions put forth by both the State and the Defense, and it is the conclusion of the Court that the testimony of [A.K.] was clear, convincing, and candid in all respects."

Defendant urges that the court's use of the word "corroboration" establishes that it impermissibly used the impeaching testimony for its truth in order to find defendant guilty of the crime. While we agree that one may reasonably interpret the above statement as defendant does, we find another equally reasonable interpretation to be that the court found the victim's credibility to be unsuccessfully challenged by the fact that on the stand she stated that she first informed her boyfriend of the assault, when, in reality, she told another person before telling him. In a bench trial, the court has the responsibility of weighing the credibility of the witnesses (*People v. Slim* (1989), 127 Ill. 2d 302, 307, 537 N.E.2d 317, 319; *People v. Brown* (1990), 197 Ill. App. 3d 907, 557 N.E.2d 199); therefore, we may appropriately view the above-quoted statement as merely its pronouncement explaining why it found the victim to be a credible witness.

As stated previously, the trial judge, as the trier of fact, is presumed to know the law and to have considered only competent evidence in reaching his determination on the merits in a bench trial. (*Guest*, 115 Ill. 2d 72, 503 N.E.2d 255; *Pelegri*, 39 Ill. 2d 568, 237 N.E.2d 453; *Cruz*, 224 Ill. App. 3d 425, 586 N.E.2d 658.) In order to rebut this presumption, there must be an affirmative showing in the record that the trial judge actually used the evidence improperly as alleged. (*People v. Gunartt* (1991), 218 Ill. App. 3d 752, 760, 578 N.E.2d 1081, 1087, *appeal denied* (1991), 142 Ill. 2d 659, 584 N.E.2d 134; see also *People v. Puhl* (1991), 211 Ill. App. 3d 457, 472, 570 N.E.2d 447, 457, *appeal denied* (1991), 139 Ill. 2d 602, 575 N.E.2d 920.) In the instant case, since the court's equivocal statement upon which defendant rests his entire argument may be seen as constituting the proper use of the victim's prior inconsistent conduct, defendant has not overcome the presumption of regularity; accordingly, we hold that the trial court did not err.

## II

Defendant next claims that the trial court erred in allowing the testimony of John Mikrut, who testified that on the evening of July 22, 1991, approximately 18 hours after the incident, the victim had described how defendant had knocked on the window, told her he was there to pick up his cosmetics order, withdrew a gun and forced her

to engage in sexual relations with him. Defendant now complains that this testimony was inadmissible hearsay and that the court committed reversible error by not excluding it. The State initially responds that because defendant objected to the reception of hearsay into evidence for the first time in his post-trial motion, he has waived the issue for the purposes of review.

We must agree with the State. Our supreme court has held that in order to preserve for review a question of the admissibility of evidence, a defendant must object in a timely fashion at trial and renew the assertion of error in his motion for a new trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Defendant counters that although *he* may have appreciated the inadmissible nature of Mikrut's testimony when it was offered, he could not register a contemporaneous objection to the admission of this hearsay until such time that its inadmissibility became evident to the trial court, which, according to him, did not occur until he offered the testimony of Ms. Kubicka. He contends that no objection is valid unless its grounds have been offered into evidence or presented to the court. Assuming *arguendo* that we were to find merit in defendant's "premature objection" argument, that rule would in no event relieve him of his obligation to make what would, even in that instance, constitute a timely objection.

It has long been established that an objection to evidence is untimely if not asserted as soon as its ground becomes apparent. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.) Where the ground for objection does not appear until after the admission of the evidence, the appropriate action for its opponent is to make a motion to strike. (*People v. Fritz* (1981), 84 Ill. 2d 72, 417 N.E.2d 612.) After the basis of the motion to strike is available, it must be made as soon as practicable or the would-be movant will be deemed to have waived any complaint with regard to that evidence. *Levin v. Welsh Brothers Motor Service, Inc.* (1987), 164 Ill. App. 3d 640, 659, 518 N.E.2d 205, 217, *appeal denied* (1988), 119 Ill. 2d 558, 522 N.E.2d 1246; *Louis L. Weinzelbaum, Inc. v. Abbell* (1964), 49 Ill. App. 2d 442, 449, 200 N.E.2d 43, 47.

In the case at bar, defendant concedes that the ground for the inadmissibility of Mikrut's testimony became apparent after he presented the testimony of Ms. Kubicka, yet he never moved to strike that testimony at trial, instead apprising the court of its inadmissibility for the first time in his motion for a new trial. In *People v. Driver* (1978), 62 Ill. App. 3d 847, 379 N.E.2d 840, the court held that the defendant's motion to strike inadmissible evidence which was raised

at the close of the defendant's case was untimely. In *People v. Bean* (1974), 17 Ill. App. 3d 377, 308 N.E.2d 334, the court held that since the State's motion to strike the testimony of defendant's five alibi witnesses was untimely, the trial court erred when it granted the motion. In *Bean*, the State was aware of the grounds for its motion from the start of trial, and it nonetheless remained silent until the start of its rebuttal case. Here, defendant was aware of the hearsay nature of Mikrut's testimony well before his objection to it was asserted for the first time in his post-trial motion. Since this constitutes an even greater lapse of time between knowledge of inadmissibility and an attempt to strike the incompetent evidence than that found fatal in both *Bean* and *Driver*, we are compelled by those decisions to find that defendant's failure to move to strike constitutes waiver of the issue for the purposes of review.

Moreover, as will be discussed in more detail below, even if we were to consider the admission of the hearsay to be error under the plain error rule (134 Ill. 2d R. 615(a)), we would nonetheless hold it harmless because the trier of fact expressly found the victim to be more credible than the defendant. Under *People v. Schott* (1991), 145 Ill. 2d 188, 582 N.E.2d 690, which rejected the aged Illinois rule which had found convictions for rape reversible unless the victim's testimony was corroborated or the trier found it to be clear and convincing, we must defer to the fact finder where the dispositive question in a sexual assault prosecution touches upon the credibility of witnesses. Here the case turned entirely on the credibility of the victim and the accused, and so, given the court's unequivocal indication of which of the two it chose to believe, we deem the possibly erroneous admission of this hearsay testimony to be harmless beyond a reasonable doubt.

## III

Defendant's third assignment of error questions whether the court impermissibly received evidence that he fled from police five days after the assault of A.K. He argues that at the time of the admission of the evidence, the record before the court contained nothing which manifested that he was aware that he was a suspect, which, he maintains, is a necessary predicate to the admission of "flight" evidence.

Evidence of a suspect's flight from police is admissible as a circumstance from which the trier of fact may draw the inference that the defendant is conscious of his own culpability, and that such consciousness is, therefore, probative of his guilt of the crime charged.

*(People v. Assenato* (1991), 224 Ill. App. 3d 96, 586 N.E.2d 445, *appeal denied* (1992), 144 Ill. 2d 636, 591 N.E.2d 24.) While proof that defendant knew he was suspected of criminal activity is a foundational requirement which must be satisfied prior to the introduction of flight evidence *(People v. Wilson* (1980), 87 Ill. App. 3d 693, 409 N.E.2d 344), contrary to defendant's contention, there need not be direct proof that the defendant knew that he could be arrested. *(People v. Griffin* (1974), 23 Ill. App. 3d 461, 463, 318 N.E.2d 671, 674.) "If the circumstances were such as to give the defendant 'reason to know' that [the arresting officer] was an officer, the trier of fact would be warranted in drawing the inference of actual knowledge." *Griffin,* 23 Ill. App. 3d at 464, 318 N.E.2d at 674.

■ In the case at bar, there was sufficient evidence before the trier of fact which would allow it to infer that defendant knew he was a suspect concerning some crime. Five days after the assault committed on A.K., Detective Collins knocked on the door of defendant's home, and in response, he leaned out of an upstairs window to inquire who was calling. The detective informed defendant that he was a police officer and sought a moment of his time to ask a few questions, to which defendant acquiesced, advising the officer that he would come down to him. After waiting a period of time, the detective again rapped on the door, which was answered by defendant's girl friend. Obviously, defendant had a reason to know that the person at his front door was a policeman since the officer identified himself as one; and just as clearly, the trier of fact could consider the fact that he did not speak to the officer after telling him that he would as ample proof of his consciousness of guilt. We consequently see no error in the reception of this evidence over defendant's objection.

### IV

Defendant next takes issue with the adequacy of the services provided by the court-appointed interpreter. Since defendant spoke only minimal English, a Polish-speaking interpreter was provided for him. On March 31, 1992, the second interpreter, Renata Jesmantas, admitted to the court, through the prosecutor, that she had previously misinterpreted a response of defendant to a question asked on cross-examination. The prosecutor clarified the error for the record, including the proper translation of defendant's statement. Furthermore, in an affidavit accompanying his post-trial motion, defendant raised other errors and omissions made by the same translator. He maintains that the errors cast a negative light on his testimony, thus damaging his

credibility before the trier of fact, which proved to be fatal to defendant.

The use of an interpreter is within the sound discretion of the trial court, the exercise of which is abused only where it deprives the defendant of some basic right. (*People v. Shok* (1957), 12 Ill. 2d 93, 145 N.E.2d 86; *People v. Costales* (1988), 166 Ill. App. 3d 234, 520 N.E.2d 421, *appeal denied* (1988), 121 Ill. 2d 574, 526 N.E.2d 834; *People v. Starling* (1974), 21 Ill. App. 3d 217, 315 N.E.2d 163.) A defendant has no cause to complain where an interpreter's presentation of testimony is understandable, comprehensible and intelligible, and if it is not understandable, the unintelligibility of the translated testimony will warrant reversal only when it is rooted in the ineffectiveness of the interpreter. (*People v. Niebes* (1979), 69 Ill. App. 3d 381, 387 N.E.2d 800; *Costales*, 166 Ill. App. 3d 234, 520 N.E.2d 421.) Minor testimonial inconsistencies arising from linguistic misunderstandings do not warrant reversal of a conviction. (*People v. Brinkley* (1965), 33 Ill. 2d 403, 211 N.E.2d 730.) Moreover, we must be particularly averse to second-guess a trial court's determination that an interpreter adequately translated the testimony, given that so much of that determination turns on factors such as inflection and emphasis, concerns which cannot be adequately divined from the transcript of proceedings. *Niebes*, 69 Ill. App. 3d 381, 387 N.E.2d 800.

In *People v. Starling* (1974), 21 Ill. App. 3d 217, 315 N.E.2d 163, it was held that the trial court abused its discretion in this regard by failing to replace as incompetent an interpreter who had to be repeatedly admonished not to hold a private conversation with the witness while counsel attempted to examine and cross-examine the Spanish-speaking complainant who was the State's sole occurrence witness. In addition, both the defense attorney as well as the State had complained that the interpreter did not properly translate their questions.

■ Here, defendant's affidavit asserts only minor discrepancies between the questions asked and the translated versions he received and which the trial court found to be insignificant. For example, he stated that the interpreter never asked him the name of his girl friend even though the transcript of the proceedings includes many references to that question. After a comprehensive review of the entire transcript of the proceedings, the court found that none of the alleged mistranslations dealt with matters material to its determination. On review, defendant points to no mistaken translations other than those which the trial court found immaterial or collateral to the central issues in the case; thus, we cannot say that the court's refusal to appoint a new translator, or to grant a new trial because of her al-

leged incompetence, constituted an abuse of its vast discretion in this area.

## V

Defendant lastly claims that there was insufficient evidence to find him guilty beyond a reasonable doubt. We note at the outset that defendant's argument is wholly dependent on his misapprehension of the recent law in this area. Until 1991, the rule in Illinois was that in order to sustain a conviction for rape, the victim's testimony had to be either substantially corroborated by independent evidence or the trier of fact had to find it clear and convincing. (See, *e.g., People v. Coates* (1985), 109 Ill. 2d 431, 488 N.E.2d 247, *overruled by People v. Schott* (1991), 145 Ill. 2d 188, 582 N.E.2d 690; *People v. Bell* (1991), 217 Ill. App. 3d 985, 577 N.E.2d 1228, *appeal denied* (1991), 142 Ill. 2d 655, 584 N.E.2d 132.) In *Schott,* our supreme court found it

> "incongruous for an appellate court to view a sex-offense victim's testimony with skepticism by employing this special standard of review, when a fact finder has previously considered the testimony of the victim, together with any other evidence presented at trial, and found the defendant guilty beyond a reasonable doubt." (*Schott,* 145 Ill. 2d at 202, 582 N.E.2d at 697.)

In place of the "clear and convincing evidence" test, the court applied the standard used for review of all other convictions, the reasonable doubt test of *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, the most recent formulation of which was provided in *People v. Sutherland*:

> "[W]hether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.] The reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial. [Citations.] This standard of review does not allow the appellate court to 'substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses [citation].' [Citation.] Therefore, [the reviewing court] will not reverse a criminal conviction unless the evidence is so 'unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt [citation].' [Citation.]" *People v. Sutherland* (1992), 155 Ill. 2d 1, 17.

Such deference to the fact finder's impressions of credibility, of course, applies to bench trials as well as to cases tried before a jury. *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317.

Here, defendant's contention centers on the fact that when all the evidence he claimed was inadmissible (the substantive use of Ms. Kubicka's testimony, the corroborative hearsay statements of the victim to her boyfriend, and the evidence of defendant's flight from the police) is removed from the consideration of the fact finder, the dispositive issue in the case is the relative credibility of the victim and himself, and since he had impeached her testimony with regard to the first individual she informed of the assault, while his testimony remained unsullied, the court erred in finding the victim more credible.

■ However, " '[t]he fact that a witness, be he a party or otherwise, has made out-of-court statements inconsistent with his sworn testimony does not *per se* destroy the probative value of his testimony, and it ordinarily remains for the trier of fact to determine where the truth lies.' [Citations.]" (*Converters, Inc. v. Industrial Comm'n* (1975), 61 Ill. 2d 218, 224, 334 N.E.2d 155, 159, quoting *Guthrie v. Van Hyfte* (1966), 36 Ill. 2d 252, 258, 222 N.E.2d 492, 495; *People v. Pecka* (1984), 125 Ill. App. 3d 570, 574, 466 N.E.2d 404, 408 ("Even assuming such inconsistent testimony as defendant alleges, inconsistent statements do not of necessity invalidate a witness' testimony").) In the case at bar, the trial court clearly stated that after considering defendant's rendition of the events that evening, he found his testimony not worthy of belief. The court doubted that the victim of a theft, as defendant purported to be, would not contact the authorities, and the judge found it especially dubious that such an individual would fail to inform or even to respond to an officer who appeared at the front door of his home a few days after he was supposedly victimized.

In addition, the court found that A.K.'s credibility was not harmed by the minor inconsistency between her testimony that she first told her boyfriend about the assault some 18 hours after it occurred and the subsequent proof that she actually told Ms. Kubicka only two hours later. We need not discount the assessments of credibility of a witness made by the trier of fact merely because trivial inconsistencies in her testimony are brought to light. (*People v. Mays* (1980), 81 Ill. App. 3d 1090, 1099, 401 N.E.2d 1159, 1166.) "[P]recise consistency as to purely collateral matters is not required to establish guilt beyond a reasonable doubt." (*Mays*, 81 Ill. App. 3d at 1099, 401 N.E.2d at 1166.) Whom A.K. first told that she was sexually assaulted has no effect on the validity of her testimony with regard to

whether she was assaulted or who the perpetrator of the assault was. Since that insignificant collateral inconsistency does not render the victim's testimony as a whole so improbable as to raise a reasonable doubt as to defendant's guilt, we have no choice under the commands of *Sutherland* but to affirm the trial court's finding of guilt.

Affirmed.

HARTMAN and DiVITO, JJ., concur.